## STATE OF CONNECTICUT *v.* RAINEY RANDOLPH
## (10403)

Speziale, C. J., Healey, Parskey, Shea and Grillo, Js.

Argued March 9—decision released July 5, 1983

*Suzanne Zitser,* assistant public defender, with whom, on the brief, were *Jerrold H. Barnett,* public defender, *Bruce A. Sturman,* assistant public defender, and *John R. Gulash, Jr.,* for the appellant (defendant).

*Edward J. Caldwell,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury, the defendant, Rainey Randolph, was found guilty of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1)[1] and sentenced to a term of not less than nine years nor more than eighteen. In this appeal, the defendant is claiming that the trial court erred with respect to three evidentiary rulings. The specific claims will be set out after a recitation of that evidence which is relevant to the issues raised by this appeal.

In the evening of December 18, 1979, Joe Otis Dupree was shot and killed next to one of the buildings located in Father Panik Village in Bridgeport. At the defendant's trial, Ruby Murphy was the state's principal witness. Murphy was a tenant in one of the buildings situated in Father Panik Village. She testified that at about 6 p.m. on December 18, 1979, she left her building to take a walk outside by herself. She immediately saw two men running towards her with one chasing the other. She could describe the man being chased, who turned out to be the victim, but testified that she had never seen him before. The victim was being pursued by a man with a large gun whom she knew as "Big Hand Pete." Murphy made an in-court identification of the defendant as being the man she saw chasing the victim. She had known the defendant for nine to ten years and testified that he used to go out with her younger sister. As the men approached her, she asked what was going on and testified that the defendant had replied: "I'll kill the [M----- F-----]." At that time, the defendant fired a shot which Murphy thought had struck the victim because he slowed down. The two men continued the chase, with the victim going around a

---

[1] General Statutes § 53a-55 (a) (1) provides: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person."

corner of the building. Murphy then heard a second shot fired, but did not see it because she had moved behind a dumpster, a big trash can. A few seconds later, the defendant walked back by her and, upon her inquiry as to what had happened, repeated his previous statement: "I'll kill the [M----- F-----]." He then walked away.

By way of illustrating Murphy's testimony, the state introduced a sketch, while she was testifying, containing a layout of a few of the buildings in Father Panik Village which were relevant to the crime scene. It also depicted the positions of Murphy, Dupree and Randolph as the shooting occurred. This sketch was made by Detective Thomas Giblin of the Bridgeport police department later that night at police headquarters during an interview with Murphy. It was based, in part, upon his knowledge of Father Panik Village and, in part, upon information supplied to him by Murphy. When the sketch was offered, Murphy was asked if "this [was] the sketch that was made to assist you to tell them [the police] what had happened and where it has happened?" She answered "Yes" and the sketch was admitted as a full exhibit. Murphy referred to the sketch as she described the shooting.[2]

After the shooting, Murphy returned to her apartment without investigating what actually happened to the victim. She testified that her boyfriend, Ben Jones, and her two children were present at that time in her apartment. Jones then went out to the grocery store and upon his return informed her that he had seen a body outside and that the man was dead. She then went back outside with her sister and saw the body of the same person whom she had seen earlier being chased by the defendant.

---

[2] Right after its admission the sketch was shown to the jury. At that time, Murphy left the witness stand, went down in front of the jury and was questioned there concerning this sketch which "was made by the detective when [she was] telling him what happened."

Murphy testified that she talked to the police on two occasions that night while in her apartment, although Giblin testified that he had only been there once. She did not tell the officer who came the first time very much because her boyfriend kept telling her to "shut up." The second time, however, although she was reluctant to speak at first, she eventually did tell Giblin what happened and then accompanied him to the police station. There she gave a signed statement, made a photographic identification of the defendant after being shown seven photographs,[3] and assisted Giblin as he made the sketch that has been referred to earlier. Finally, Murphy testified that no promises had been made to her in reference to her testifying against Randolph and that no threats or promises had been made to her to induce her to sign her written statement to the police.

During his cross-examination of Murphy, the defendant's counsel sought to impeach her credibility by eliciting testimony regarding the fact that she had been arrested and had a case pending against her at that time in the same judicial district.[4] She testified that she

---

[3] All seven photographs were admitted into evidence.

[4] Her full testimony on this point was as follows:

"Q. Now, right now, as of this point in time, do you have a case pending in this court?

"A. Yes, I do.

"Q. And is that in connection with an arrest of you at your apartment in a seizure of approximately 100—

"Mr. Caldwell: Objection, your Honor.

"Q. —packets of heroin?

"Mr. Caldwell: I object to the form of the question.

"Mr. Gulash: I would certainly claim it.

"The Court: I will allow it.

"Q. Is it in connection with an arrest of you at your apartment in a seizure by the police of approximately 100 bags of heroin?

"A. Well, it was in my apartment. Yes, it was.

"Q. And is it also in connection with a seizure of a .38 revolver?

did have a case pending and that it was in connection with her arrest at her apartment. She also testified that the police had found, and seized, approximately 100 bags of heroin in her apartment, as well as a .38 caliber

"A. The guy was there, yes, but I didn't know the stuff was there.

"Q. In connection also with a seizure of a sawed-off shotgun?

"Mr. Caldwell: May I be heard on the objection?

"The Court: The jury is excused. (Whereupon the jury was excused from the courtroom.)

"Mr. Caldwell: The form of the question is calculated to tell the jury that there were approximately 100 bags of heroin in the apartment of the witness at the time of this arrest. I'm sure counsel would agree that maybe allegedly there was 100 bags of something purporting to be heroin, would be much more appropriate. Counsel doesn't know, I don't know, whether or not, in fact, there was heroin in there. The question plants right in the minds of the jury 100 bags of heroin. That isn't so, your Honor.

"Mr. Gulash: I will rephrase it as to what is alleged to be heroin, if that will cure any objection on the part of the state.

"The Court: All right.

"Mr. Caldwell: And, also, a shotgun. I don't know whether it was a shotgun or a BB gun.

"The Court: It is admissible.

"Mr. Caldwell: I have no quarrel with the form of the question. I submit it is very important, strongly objectionable in the manner which it is asked, because it recites in the question that this is a fact. Counsel knows better.

"Mr. Gulash: If it wasn't a fact, the witness would be in a position to indicate it to the court.

"The Court: I will allow the question.

"Mr. Caldwell: Well, your Honor understands the basis of my objection. I take exception.

"The Court: All right. (Whereupon the jury entered the courtroom.)

"Q. In connection with the arrest at your apartment was not also a sawed-off shotgun seized?

"A. Yes—

"Q. Just a yes or no. Was not a pellet gun seized?

"A. A what?

"Q. A pellet gun?

"A. It probably was.

"Q. Were not shotgun shells seized?

"A. I don't know what was there. I was in my bed asleep.

"Q. And do you recall whether or not .38 bullets were seized?

"A. I told you I don't know what was in there.

"Q. To the best of your knowledge are you presently charged with possession of narcotics with intent to sell?

"A. Yes, I am.

"Q. And possession of a sawed-off shotgun?

revolver, a sawed-off shotgun, and "probably" a pellet gun. The defendant's counsel then asked: "As of now, are you aware that for the charge of possession of narcotics with intent to sell you're facing a possible sentence of 15 years in jail?" The state's objection to the question was sustained and the court instructed the jury that it was to disregard the question. Defense

"A. Yes, I am.

"Q. And that case is pending before this court, right now, is it not?

"A. Yes, it is.

"Q. As of now, are you aware that for the charge of possession of narcotics with intent to sell you're facing a possible sentence of 15 years in jail?

"Mr. Caldwell: Objection.

"The Court: Sustained, I sustained the objection. You are to disregard that.

"Mr. Gulash: I will take an exception.

"The Court: It may be noted.

"Q. To the best of your knowledge, Miss Murphy, are you represented by an attorney in that case?

"A. I beg your pardon?

"Q. Are you represented by an attorney on your case, the case that you have pending in this court?

"A. Yes, I am, a public defender.

"Q. And to the best of your knowledge, has your attorney discussed this case with the state's attorney's office in this court?

"A. I beg your pardon?

"Q. To the best of your knowledge, has your attorney discussed your pending case with the state's attorney's office in this courthouse?

"Mr. Caldwell: Objection, your Honor. Counsel must represent that he will make that question relevant by direct evidence of his own, otherwise is he calling upon me to take the stand?

"The Court: Do you want me to excuse the jury?

"Mr. Caldwell: My objection is obvious.

"The Court: I will overrule you.

"Mr. Caldwell: My exception is equally obvious.

"The Court: The exception is noted.

"Q. Would you answer the question?

"A. I didn't understand it.

"The Court: Has your attorney discussed your case with the state's attorney, do you know?

"The Witness: We talked.

"The Court: Just answer yes or no.

"The Witness: Yes."

counsel took an exception to the ruling, without asking either the state's attorney or the court the basis for their reasoning. Defense counsel then went on to question Murphy further as to whether she was represented by counsel in that pending action and whether her counsel had discussed her case with the state's attorney. She answered affirmatively to both questions.

After Murphy had finished testifying, the state called Giblin to the stand. He testified, inter alia, as to his investigation on the night of the shooting and about his contact with Murphy on that night. During his testimony, the state's attorney referred him to the sketch of the scene that had previously been introduced without objection as an exhibit through Murphy. He identified the sketch as "the sketch I drew for [Murphy]," in order to help her "identify where she was and what she saw." When the state's attorney requested Giblin to come down from the witness stand to explain to the jury what the sketch intended to show, defense counsel objected. He claimed that any testimony would be hearsay because Giblin drew the sketch as a result of information that he obtained from Murphy. The trial court reserved decision on the objection because Giblin had not testified in any manner regarding the sketch at that time. Thereafter, the state's attorney asked some preliminary questions about the location of certain buildings and streets depicted on the sketch, which Giblin testified he drew based upon his personal observation.[5] The state's attorney then asked Giblin to identify the meaning of certain lines and arrows on the sketch. At this point, defense counsel renewed his ob-

---

[5] Giblin, who had been a member of the Bridgeport police department for twelve years, testified that he was familiar with the general area of the shooting not only from the incident of December 18, 1979, but also from other work he had done for that department.

jection. During a voir dire concerning the further admissibility of Giblin's testimony, the trial court rejected the claim that the testimony was "classic hearsay when the individual he [Giblin] discussed it with [Murphy] was here and available for testimony." In addition, the state's attorney argued that the sketch would be "enlightening to the jury," and that Giblin, who was available for cross-examination, "should be given an opportunity to explain what he put together." The court overruled the objection to which an exception was taken. Thereafter, Giblin testified, specifically in response to four questions by the state, concerning certain information Murphy had indicated to him when the sketch was being prepared.

Finally, as part of his defense, the defendant called Doris Coles to the stand. Coles' testimony conflicted with various aspects of Murphy's testimony. In particular, she testified that on the day of the shooting she had spent the whole day with Murphy, whereas Murphy testified that she did not even know Coles at the time. Coles testified that at around 5:30 p.m. on the night of the shooting she went to the store. When she returned, she saw a body next to one of the buildings, which she subsequently found out was the victim. When she went up to Murphy's apartment, Coles testified that Murphy did not give her any indication that she knew what had occurred.

During cross-examination she testified that her five children lived in foster homes. Thereafter, over the objection of defense counsel, she was asked why they were in foster homes, and she responded that she was financially and mentally unable to take care of them at that time. A number of questions followed as to the details of how and why they were put in foster homes. The state's attorney claimed that the answers were relevant, while defense counsel objected to them on only

two occasions on the basis that they were "far afield" and irrelevant. The trial court overruled the objection, and defense counsel took an exception only after his second objection was overruled.

As noted previously, the defendant claims the trial court erred in regard to three evidentiary rulings. First, he claims the court erred in allowing into evidence Giblin's testimony concerning the contents of the sketch Giblin made based upon information provided to him by Murphy because such testimony was hearsay. His second claim is that the court erred in limiting the cross-examination of Murphy and, as a result, deprived him of his sixth amendment rights. Finally, the defendant claims that the trial court erred in admitting into evidence, upon the state's cross-examination of Coles, evidence that was irrelevant to either the issues raised by the case or to her credibility.

We consider first the issue of whether Giblin's testimony regarding the sketch of the crime scene was hearsay. It is well recognized that a "*statement* made out of court which is offered to establish the truth of the facts contained in the statement is hearsay." (Emphasis in original.) *State* v. *Packard,* 184 Conn. 258, 274, 439 A.2d 983 (1981); see *State* v. *DeFreitas,* 179 Conn. 431, 439–40, 426 A.2d 799 (1980). In determining whether Giblin's testimony was hearsay, as the defendant claimed in his objection, we will examine that testimony concurrent with what the sketch itself purportedly portrayed because we have said that under certain circumstances, a sketch or map is "no more than the pictorial representation of the testimony of the witness through whom it was offered in evidence." *Aczas* v. *Stuart Heights, Inc.,* 154 Conn. 54, 56, 221 A.2d 589 (1966), quoting *Banks* v. *Watrous,* 134 Conn. 592, 595, 59 A.2d 723 (1948); see also *State* v. *Packard,* supra; see generally 3 Wigmore, Evidence (Chad-

bourn Ed.) §§ 790, 791. The weight of such an exhibit is, of course, for the jury. *Petroman* v. *Anderson,* 105 Conn. 366, 370, 135 A. 391 (1926). If the sketch could not be admitted through Giblin on hearsay grounds, it follows that his testimony concerning the sketch would also be objectionable in that the sketch was merely a "pictorial representation" of his testimony.

A sketch that is drawn up based upon a witness' personal observation and which is introduced through that witness who is competent to identify and explain its contents would not be hearsay assuming the sketch is being introduced in order to illustrate or explain the witness' in-court testimony. See *State* v. *Piskorski,* 177 Conn. 677, 726–28, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *Terminal Taxi Co.* v. *Flynn,* 156 Conn. 313, 318–19, 240 A.2d 881 (1968); *Capone* v. *Sloan,* 149 Conn. 538, 543, 182 A.2d 414 (1962). Where, however, a sketch is drawn up based upon information entirely provided to the testifying witness, and the sketch is introduced in order to prove the truth of what it depicted, then the sketch clearly would be hearsay. See *Terminal Taxi Co.* v. *Flynn,* supra; *Catrett* v. *State,* 25 Ala. App. 331, 332–33, 146 So. 287 (1933); *Jenkins* v. *State,* 263 Ind. 589, 592–93, 335 N.E.2d 215 (1975); *Blue Ridge Bank* v. *State Banking Board,* 509 S.W.2d 763, 766 (Mo. Ct. App. 1974); compare *Griffin* v. *Gregory,* 355 So. 2d 691, 693 (Ala. 1978); *Timsah* v. *General Motors Corporation,* 225 Kan. 305, 310–12, 591 P.2d 154 (1979). To hold otherwise would create a situation where a police officer would be barred from testifying in regard to oral statements made out of court to that officer where they are offered to prove the truth of the matter asserted; see *State* v. *Jeustiniano,* 172 Conn. 275, 282–83, 374 A.2d 209 (1977); while permitting the officer to testify

as to the exact same statements as long as he has written the statements down in the form of a sketch. Where a sketch is a pictorial representation of a witness' testimony, there is absolutely no basis for drawing such a distinction. With these general principles in mind, we now turn to the evidentiary ruling in this case.

The state properly introduced the sketch of the crime scene, without objection, through Murphy. Murphy personally observed the shooting; therefore, she was competent to identify and explain the sketch, including the positions of the victim and the defendant as the crime occurred. Giblin did not observe the shooting. Therefore, if he testified as to what took place and that testimony was introduced for the truth of the matter asserted, then the defendant's objection to that testimony should have been sustained on the basis that it was hearsay.

The state has set forth three reasons why the trial court's ruling was correct. First, it asserts that "much" of the sketch was drawn from the personal knowledge of Giblin. Second, it claims that Giblin's testimony was not offered to prove the truth of the matter therein. Rather, his testimony were offered to explicate a sketch that was already introduced as a full exhibit and which Giblin had a hand in drawing up. It also claims that even if the testimony were hearsay, it was admissible as a prior consistent statement to rehabilitate Murphy's testimony which had been impeached by a suggestion of bias as a result of her testimony of her pending criminal charges in the same court. Finally, the state argues that even if Giblin's testimony here is considered hearsay, the error was harmless.

The state's claim that Giblin's testimony was admissible as a prior consistent statement can be dealt with summarily. Clearly, such testimony is admissible to

rebut a suggestion of bias or interest. *State* v. *Brown,* 187 Conn. 602, 608–609, 447 A.2d 734 (1982). The prior statement, however, must be made at a time when the potential for bias or interest did not exist. *State* v. *Brown,* supra, 608. The state's brief admits that "the record does not disclose the exact date upon which Mrs. Murphy was arrested," but claims that "it had to be clear to the jury from her testimony" that her arrest took place subsequent to the time when she gave her statement to the police regarding the shooting for which the defendant was being tried. The problem with this claim is that it is the trial court judge, and not the jury, who determines the admissibility of evidence. Here, the trial court did not make a determination, as it must; see *State* v. *Ouellette,* 190 Conn. 84, 98, 459 A.2d 1005 (1983); that Murphy's prior statements were given at a time when her claimed bias did not exist. Nor does the record establish this fact, as the state concedes. Therefore, the prior consistent statement exception to the hearsay rule is inapplicable to this case.

The state's second ground for upholding the trial court is its claim that the sketch was based, in large part, upon Giblin's personal observation. In regard to Giblin's testimony concerning the layout of the buildings and streets depicted on the map, our reading of the transcript indicates this is true. Therefore, his testimony in that regard was properly admitted.

Giblin was then asked a series of four questions which he answered as follows: "Q. Now, 1A is Ruby at the first shot, which was right here. Now, what is that supposed to mean with respect to this diagram?

"A. These are the positions that Ruby Murphy indicated to me of her, the victim, and Pete when she first encountered them and saw the first shot fire.

"Q. And I see here, 'Sound of the second shot came from . . .' with an 'X.' Can you tell the jury what that is intended to explain?

"A. Ruby indicated that the parties ran to that point, out of her sight, around the corner of Building 41, and she heard the second shot.

"Q. All right. And the line coming out and going towards King Drive is intended to illustrate what?

"A. That is the direction that Ruby Murphy indicated that she saw Pete Randolph going."[6] It is clear from each of his answers that Giblin was not testifying from personal knowledge, but from what "Murphy indicated to me." Thus, his four answers were based on out-of-court declarations and, if offered to prove their truth, were inadmissible hearsay. The state claims they were not so offered; rather, it claims that they were offered to explain a sketch that Giblin was involved with drawing up. We must agree that his answers could fairly be read as coming within this limited purpose. Furthermore, because Giblin was involved in drawing the sketch there may have been a basis for his testifying so as to clear up any confusion as to what the sketch represented. The jury in this criminal trial, however, were fairly left with the impression that his testimony was not only offered for its explicative purpose, but also for its truth that the defendant was involved in the shooting in the manner described. The trial court erred in admitting this evidence.

We must, therefore, determine whether the trial court's error was harmful. Inasmuch as the defendant has not claimed that this error deprived him of a con-

---

[6] Our examination of the transcript discloses that the state's examination of Murphy indicates no testimony on the significance of the designations of "1A," "1B" or "1C" on the sketch. The defendant's examination of Murphy refers only to "1A" on the sketch, and not "1B" or "1C."

situtional right, it is his burden to demonstrate that the error was harmful. *State* v. *Brown,* supra, 611, and cases cited therein.

The testimony that was objected to consisted of four answers that do not even approach the devastating effect of the testimony that we found harmful in *State* v. *Ouellette,* supra. Furthermore, the four answers were all couched in terms of explaining what three marks on the sketch were intended to depict, with the sketch already being a full exhibit. Moreover, Murphy had been examined and cross-examined about the sketch as well as having given considerable testimony concerning the event of the shooting of December 18, 1979, without reference to the sketch. The defendant was entitled to and exercised a broad right of cross-examination, not only on her testimony concerning the matters depicted on the sketch, but throughout the testimony. See *State* v. *Cooper,* 182 Conn. 207, 213, 438 A.2d 418 (1980). Not only during her testimony, but throughout the entire trial, defense counsel's questioning constantly made the jury aware of his claim of Murphy's bias, interest or motive in testifying as she did. We note that the sketch was admitted through Murphy, who was the first witness to testify, and not through the police officer. It is a "rudimentary graphic illustration of the crime scene" on a plain piece of paper which was never claimed to be to scale or to contain any measurements. We are aware that "[t]he more official and authoritative a writing appears to be, the less likely that even cautious or cynical individuals will be able to resist the temptation to regard the accuracy of the contents of the document as being beyond reproach." *United States* v. *Quinto,* 582 F.2d 224, 235 (2d Cir. 1978). This was no such document. In discussing error assigned to the admission of evidence, we have said: "An erroneous ruling should not be considered reversible error if the

evidence admitted thereby has already properly entered the case." *State* v. *Jeustiniano,* 172 Conn. 275, 283, 374 A.2d 209 (1977); see *State* v. *Barber,* 173 Conn. 153, 160, 376 A.2d 1108 (1977); *Obermeier* v. *Nielsen,* 158 Conn. 8, 12, 255 A.2d 819 (1969). This limited evidence of Giblin can be said to be merely cumulative and not constitute reversible error. Although the doctrine of harmless error, even in the face of nonconstitutional error as here, should be applied cautiously, in the circumstances of this case we find its application warranted to this claim.

The second evidentiary question raised by the defendant in this case is whether the trial court erred and violated his sixth amendment right to confront the witnesses against him by limiting cross-examination of the state's witness, Ruby Murphy. The basis for this claim arises from the fact that the trial court sustained an objection by the state to one question put forth by defense counsel to Murphy.

In order to assess this claim properly, it is important to examine all of the circumstances surrounding the court's ruling. Prior to the state's objection, defense counsel had elicited from Murphy the fact that she had been arrested on the basis of charges that the police had seized from her apartment one hundred bags of heroin, three guns, including a sawed-off shotgun, and some ammunition that she could not recall was there. During this questioning the state objected on two occasions based upon the form of the questions being asked. The trial court then sustained an objection to the following question: "As of now, are you aware that for the charge of Possession of Narcotics with Intent to Sell you're facing a possible sentence of 15 years in jail?" No basis was given for either the state's objection or defense counsel's exception. Thereafter, defense counsel continued his cross-examination of Murphy in

regard to the charges against her by asking whether she had discussed them with her attorney and the state's attorney, to which she replied that she had. The defendant claims that the trial court's ruling deprived him of his sixth amendment right to cross-examine Murphy effectively. We disagree.

A claim of this nature was recently reviewed in *State v. Wilson,* 188 Conn. 715, 720–21, 453 A.2d 765 (1982). There, we stated that "[c]ross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State v. Corley,* 177 Conn. 243, 246, 413 A.2d 826 (1979); *State v. Luzzi,* 147 Conn. 40, 46, 156 A.2d 505 (1959). The sixth amendment to the constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' This right is secured to defendants in both state and federal prosecutions. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). The primary interest secured by confrontation is the right to cross-examination. *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965). An important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene v. McElroy,* 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). To comport with the constitutional standards embodied in the confrontation clause the defendant in exercising his right of cross-examination must be allowed 'to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' *Davis v. Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)." *State v. Wilson,* supra, 720. We cannot find that the court's ruling "when examined in the light of the impeaching pictorial display"; id., 721; constituted an infringement of the defendant's right of confrontation.

First, defense counsel was able to elicit testimony from Murphy from which the jury could made a fair determination of the serious nature of the charges against her. Defense counsel was also able to elicit testimony from her that she had talked to her attorney and the state's attorney about these charges from which the jury could imply that Murphy may have been testifying in order to help her own case. See *State v. Wilson,* supra. Furthermore, and perhaps more importantly, the trial court did not limit defense counsel's efforts to delve into these matters other than to sustain the one objection. This should be compared with *State v. Ouellette,* supra, where we held that the trial court had erred in completely prohibiting a whole line of questioning on cross-examination of the state's principal witness. See also *Thergood v. Tedford,* 473 F. Sup. 339 (D. Conn. 1978). In addition, looking at the individual objection, we cannot conclude that the effect of the trial court's ruling was to preclude defense counsel from "pursuing . . . whether or to what degree her testimony was prompted by these very serious charges" then pending in the same courthouse.[7] The state had made two previous objections to defense counsel's cross-examination of Murphy regarding her pending case, both of which went to the form of the question. The objection that the trial court sustained might very well have been on this basis. We cannot know the exact reason because defense counsel never pressed his claim. This situation should be compared with the trial court's ruling in *State v. Wilson,* supra, where defense counsel stated the basis for his question

---

[7] Defense counsel did not go into the matter of whether Murphy had been promised any consideration by the state for her testimony. On redirect, the state's attorney elicited that he had talked to her in the presence of her attorney and that no promises had been made to her "in respect to your testimony in this case." Defense counsel did not go into this on his recross. See *State v. Hackett,* 182 Conn. 511, 517–21, 438 A.2d 726 (1980).

and then offered to rephrase his question. The trial court responded by saying, "[t]here's no need to rephrase it. The objection is sustained. You surprise me at having asked the question. The jury is instructed to please strike from your mind any such reference." Id., 719. In that instance we decided to review the defendant's claim even though no exception had been taken because, inter alia, "[t]he court's action might reasonably have been understood to preclude further comment by counsel." Id., 720. No such claim can be made here.

The final issue raised by this appeal is the defendant's claim that the trial court erred in permitting the state to elicit upon cross-examination of Doris Coles, one of the defendant's witnesses, testimony that was irrelevant to either the issues raised by the case itself or to her credibility as a witness. Specifically, the defendant challenges that questioning which elicited from Ms. Coles testimony concerning the fact that her children had been living in foster homes. We find no error on this issue.

It should first be noted that the state's attorney asked a number of questions in this regard, and, thereafter, defense counsel took an exception only to the following question: "And would you tell the jury how you accomplished that (placing the children in foster homes)?" Even if we were to agree that this solitary exception preserved this issue for appeal, we could not conclude that the trial court erred. We have noted that a "trial court has broad discretion in deciding the relevancy of evidence as it pertains to cross-examination . . . and as a rule although the extent of cross-examination is within the trial court's discretion it should be liberally allowed. . . . Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of

discretion." (Citations omitted.) *State* v. *Briggs,* 179 Conn. 328, 332–33, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); see also *State* v. *Miller,* 186 Conn. 654, 670–71, 443 A.2d 906 (1982); *State* v. *Hogan,* 180 Conn. 182, 183, 429 A.2d 462 (1980). At the same time, a trial court should take care to prevent the introduction of evidence that has little or no probative value and which would reasonably tend to inflame the jury. See *State* v. *Hogan,* supra; *State* v. *Onofrio,* 179 Conn. 23, 32–33, 425 A.2d 560 (1979); *State* v. *Runkles,* 174 Conn. 405, 413, 389 A.2d 730, cert. denied, 439 U.S. 859, 99 S. Ct. 177, 58 L. Ed. 2d 168 (1978).

In the present case, Coles testified that she placed her children in foster homes because she "wasn't financially and mentally able to take care of them, at that point in my life." The witness' mental competency was clearly relevant to her credibility. Therefore, while testimony regarding the placement of one's children in foster homes might be more prejudicial than probative in some instances, we cannot conclude that the court abused its discretion in ruling as it did. *State* v. *Miller,* supra; *State* v. *Martin,* 170 Conn. 161, 166, 365 A.2d 104 (1976).

There is no error.

In this opinion the other judges concurred.