STATE OF CONNECTICUT *v.* NEVILLE NELSON
(6439)

DUPONT, C. J., O'CONNELL and FOTI, Js.

Argued December 14, 1988—decision released March 7, 1989

*Richard S. Cramer,* for the appellant (defendant).

*Paul J. Ferencek,* deputy assistant state's attorney, with whom, on the brief, was *Christopher L. Morano,* deputy assistant state's attorney, for the appellee (state).

FOTI, J. The defendant was convicted, after a trial to a jury, of possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b),[1] possession of drug paraphernalia in violation of General Statutes § 21a-267 (a),[2] and having a weapon in a motor

---

[1] General Statutes § 21a-278 (b) provides in pertinent part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marihuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person . . . ."

[2] General Statutes § 21a-267 (a) provides in pertinent part: "No person shall use or possess with intent to use drug paraphernalia, as defined in subdivision (20) of section 21a-240, to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain or conceal, or to inject, ingest, inhale or otherwise to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack,

vehicle in violation of General Statutes § 29-38.[3] The defendant appeals from the judgment of conviction.[4]

The defendant claims that the trial court erred (1) in failing to set aside the verdict as to the charge of having a weapon in a motor vehicle, (2) in permitting a police officer to testify as an expert witness, (3) in admitting hearsay evidence, (4) in admitting illegally seized evidence, (5) in denying the defendant's motion to reopen, and (6) in its instructions to the jury on the charge of possession with intent to sell. We find error on the defendant's first claim.

The jury could reasonably have found the following facts. Acting on information supplied by an informant, Detective Michael Manzi of the Hartford Police Department dialed a phone number from a public telephone

---

store, contain or conceal, or to inject, ingest, inhale or otherwise introduce into the human body, any controlled substance as defined in subdivision (9) of section 21a-240. . . ."

[3] "[General Statutes] Sec. 29-38. WEAPONS IN VEHICLES. Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both. . . . The word 'weapon', as used in this section, means any pistol or revolver, any dirk knife or switch knife or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, and any other dangerous or deadly weapon or instrument, including any slung shot, black jack, sand bag, metal or brass knuckles, stiletto, any knife, the edged portion of the blade of which is four inches or over in length or any martial arts weapon as defined in section 53a-3. The provisions of this section shall not apply to any person enrolled in and currently attending a martial arts school, with official verification of such enrollment and attendance, having any martial arts weapon including, but not limited to, nunchaku and Chinese stars in a vehicle while traveling to and from such school."

[4] The defendant was also convicted on August 4, 1987, of possession of narcotics in violation of General Statutes § 21a-279 (a). The court ordered the guilty verdict vacated and rendered a judgment of not guilty. A fifth count which charged the defendant with failure to appear in violation of General Statutes § 53a-172 was nolled by the state on September 14, 1987.

in Hartford, which activated a message center beeper. A moment later, a male voice, later identified as the defendant's, returned his call and asked Manzi what he wanted. Manzi replied that he was interested in buying a gram of cocaine. The defendant instructed Manzi to proceed to the intersection of Broad and Russ Streets in Hartford, where another pay phone was located, and to redial the phone number. When the second call was made, the message center beeper was again activated and the defendant called back. The defendant informed Manzi that the gram of cocaine would cost "a yard," which is street parlance for one hundred dollars. After Manzi agreed to pay this amount, he was told to proceed to the Kentucky Fried Chicken restaurant at 475 Park Street in Hartford to await delivery. When Manzi arrived at the restaurant, a young Hispanic female, later identified as Sonya Hernandez, approached his car, tapped on the window and asked if he had "the money." At Manzi's request, Hernandez got into his car. While in the car, Hernandez produced a lottery ticket folded in the shape of a pyramid that contained a white powder which was later tested and found to be cocaine. As planned, Manzi signaled Detective Jose Morales, who approached the vehicle, identified himself as a police officer and arrested Hernandez. Hernandez stated that she was only delivering a package for a black man who was parked three or four cars behind Manzi's car. Both detectives proceeded to this automobile where the defendant was seated in the driver's seat. When the defendant got out of his car, Manzi performed a pat-down search and discovered a message center beeper in the defendant's right front pants pocket. Seized from a compartment on the inside of the driver's door, was a ziplock bag containing a white powder later identified as cocaine. The officers then arrested the defendant. The defendant's car was seized and towed to police headquarters. An inventory

search of the vehicle produced a loaded .38 caliber handgun, and a Deering precision scale kit, which included a scale, a grinder, a funnel and rotating sifters.

I

The defendant's first assignment of error is that the state presented insufficient evidence on the issue of whether the defendant had obtained a state weapons permit and therefore, failed to prove an essential element of General Statutes § 29-38. We agree.

A person violates General Statutes § 29-38 when he or she "knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a *proper permit has not been issued* as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202 . . . ." (Emphasis added.) The term "weapon" is defined under this section and includes any "pistol or revolver . . . and any other dangerous or deadly weapon." General Statutes § 29-28[5] describes the procedure for obtaining a pistol

---

[5] General Statutes § 29-28 provides in pertinent part: "Upon the application of any person having a bona fide residence or place of business within the jurisdiction of any such authority or upon the application of any bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any state or subdivision of the United States, such chief of police, warden or selectman may issue a permit to such person to carry a pistol or revolver within the jurisdiction of the authority issuing the same, *provided such authority shall find that such applicant intends to make no use of any pistol or revolver which he may be permitted to carry thereunder other than a lawful use and that such person is a suitable person to receive such permit.* Said commissioner may, upon application, issue, to any holder of any such permit, a permit to carry a pistol or revolver within the state. Each permit to carry any pistol or revolver shall be issued in triplicate and one of the copies issued by said commissioner shall be delivered to the person to whom issued, one shall be delivered forthwith to the authority issuing the local permit and one shall be retained by said commissioner, and the local authority issuing any such permit shall forthwith deliver one of such copies to the person to whom issued and one copy to said commissioner and shall retain one of such copies. No permit for carrying a pistol or revolver shall be issued to an alien under the provisions of this section."

permit, and conditions the issuance of a state permit to the holder of a locally issued permit. The defendant argues that the state failed to produce any evidence that he did not have a state permit.

It is fundamental that any person accused of a crime is presumed innocent unless and until the state has proven his guilt by establishing each essential element of the crime charged beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Williamson,* 206 Conn. 685, 708–709, 539 A.2d 561 (1988). Our Supreme Court has concluded that the lack of a proper permit is an essential element of the crime of having a weapon in a vehicle pursuant to General Statutes § 29-38 and, therefore, the state is required to prove beyond a reasonable doubt that a defendant did not have a proper permit for the weapon as provided in § 29-28. *State* v. *Beauton,* 170 Conn. 234, 240, 365 A.2d 1105 (1976); see also *State* v. *Smith,* 9 Conn. App. 330, 338, 518 A.2d 956 (1986). In *State* v. *Beauton,* supra, the only evidence of a permit introduced by the state was that the defendant did not have a permit from the city of New Haven, the city in which he was arrested. The court held that this evidence alone was insufficient to determine whether the defendant had a valid state permit. The court found that the state should have introduced evidence as to whether the defendant had a permit from the state of Connecticut. The defendant was not a resident of New Haven.

Although the state concedes that the only evidence it produced at trial on whether the defendant had a permit was that the defendant had not been issued a permit by the city of Hartford, it argues that the facts of this case are distinguishable from *Beauton.* The state argues that the defendant is a Hartford resident and, because no local permit existed, no state permit could

exist, as the state permit is preconditioned upon the issuance of a local permit. We disagree with the state's analysis.

In this case, no evidence was presented at trial indicating how long the defendant had lived in Hartford, whether he had a place of business elsewhere, or whether he ever had a Hartford permit other than at the time of the offense. Although it is necessary to obtain a local permit before a state permit may issue, it is not necessary to renew a local permit after having obtained a state permit. Therefore, it is possible for a person to have a state permit and not to have a current local one. During oral arguments, this court queried the state as to three possible permit scenarios and, as to each, the state conceded that the evidence produced at trial would have been insufficient to sustain a conviction under § 29-38. The first situation involves a person who, at one time, was a resident of Hartford and has a place of business other than Hartford. He obtains a local permit in the town of his business and then obtains a state permit which is in effect at the time of trial. The second scenario involves a person who, while living in a town other than Hartford, obtains a local permit from that town, followed by a state permit, and then moves to Hartford, with the state permit in effect at the time of the offense. The last scenario involves a person who had obtained a Hartford permit some years ago, and then a state permit, and who does not renew his local permit, but has a valid state permit on the date of the offense.

It is evident from these examples that it was possible for the defendant to have a state permit without having one from the city of Hartford. In light of this fact, we conclude that the state did not present sufficient evidence to establish a violation of § 29-38 as it

did not establish that a proper state permit did not exist as of the date of the offense.[6]

## II

The defendant next claims the trial court erred in usurping the jury's function by permitting a police officer to testify as a narcotics expert on the issue of whether the defendant intended to sell the cocaine. We find no error.

During its case-in-chief, the state called Sergeant Robert J. Cagianello of the Hartford police as an expert witness. Cagianello is a thirteen year veteran of the Hartford police department and supervisor of that department's narcotics division. Cagianello testified that he had been involved in the field of narcotics investigation for approximately three and a one-half years and had worked on hundreds of narcotic cases that resulted in arrests and convictions. The trial court concluded that Cagianello qualified as an expert in the field of narcotics investigation, and permitted him to testify that the combination of the items seized, which included bullets, a gun, pyramid paper, a scale, and a grinder established behavior consistent with drug sales.[7]

---

[6] We note that it cannot be seriously argued that the state had an impossible task to determine whether the defendant had a state permit. See *State v. Beauton,* 170 Conn. 234, 242, 365 A.2d 1105 (1976). The matter was heard at the Hartford G.A. facility, which we judicially notice is located almost across the street, a very short walking distance, from the office of the Connecticut State Police Permit Division on Washington Street.

[7] The pertinent portion of Detective Cagianello's testimony is the following:

"[Prosecutor] (showing the witness a handgun)

"Q. Detective, I'm showing you State's Exhibit 1. Can you identify that?

"(Handed to the witness).

"A. It's a Smith & Wesson .38 caliber special. It's a revolver.

"Q. And would it surprise you to find a weapon when drugs are involved?

"[Defense Counsel] Objection.

"A. No sir. . . .

The defendant does not contest the trial court's finding that Cagianello qualified as an expert with respect to narcotics, but argues that the trial court erred in permitting the witness to testify about the ultimate issue of intent to sell.

As a general principle, "[a]n expert witness may not express an opinion on an ultimate issue of fact, which

"Q. Okay, now, detective, I'm showing you State's Exhibit 6 and as you can see, I've removed some items from the inside of this box. Can you tell us if, in the course of your experience, you've run across items of that nature before.

"A. Yes, sir.

"Q. And can you tell us, describing for the record, what each one of these items is? . . .

"By the Court:

"Q. Have you ever come across those types of items before?

"A. Yes, I have, your Honor.

"Q. Where have you come across them?

"A. In my narcotics investigations.

"Q. Okay, and do you know how those items are used?

"A. Yes, I do.

"Q. In narcotics, in the field of narcotics?

"A. Yes, I do.

"Q. Those are not designed specifically for narcotics?

"A. No, sir.

"Q. What are they designed for?

"A. Either used in chemistry labs or high school chemistry labs, pharmaceutical work.

"Q. But, you do come across them as used by --

"A. By narcotics dealers, yes, sir. . . .

"[Prosecutor] (showing the witness a funnel from the Deering Scale Kit)

"Q. The remaining item here, can you tell us what that is?

"A. Yes, this is a funnel and it's used with the rest of these items, the grinder, the strainer and the dish and this is just a funnel so they don't lose any of the cocaine.

"Q. And are items of this nature, based upon your experience, consistent with the mere possession of narcotics?

"A. No, sir.

"Q. Are they consistent with the sale of narcotics?

"A. Yes, sir. . . .

"[Prosecutor]

"Q. I'm going to show you the following items, I'm showing you State's Exhibit 1, State's Exhibit 2, which consists of 4 bullets, State's Exhibit

must be decided by the trier of fact. *State* v. *Donahue,* 141 Conn. 656, 667, 109 A.2d 364 (1954), appeal dismissed and cert. denied, 349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257 (1955). 'Experts can [however,] sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass. *State* v. *Johnson,* 140 Conn. 560, 563, 102 A.2d 359 (1954).' " *State* v. *Vilalastra,* 207 Conn. 35, 41, 540 A.2d 42 (1988). A trial court has broad discretion in admitting "expert testimony concerning the sale of illicit drugs." Id., 45.

Our resolution of this case is controlled by *State* v. *Vilalastra,* supra, which set forth guidelines for determining to what extent an expert witness may offer opinions on the issue of a defendant's intent to sell narcotics. According to *Vilalastra,* it is improper for the state to elicit testimony from an expert as to whether

4 and State's Exhibit 6 as well as State's Exhibit 7. Now, if you were to learn that the combination of these items were found, some on a defendant or in a vehicle he was in, would you, based upon your training and experience, feel that that was consistent with drug sales?

"[Defense Counsel] Objection.

"By the witness:

"A. Yes, sir. . . .

"Q. Is the combination of these items consistent with the customary practices of those who market in narcotics?

"A. Yes, sir. . . .

"[Prosecutor]

"Q. Is it customary for a person who is marketing narcotics to carry a handgun?

"A. Yes.

"Q. And why is that?

"A. For the protection of his stashes and narcotics and money for other people.

"Q. And if I was to tell you that these items that you see before you that I've read into the record as to their exhibit numbers were found on a defendant or in his motor vehicle shortly after a beeper transaction, as I've described, had occurred, would that affect the conclusion you have made to the jury? . . .

"A. Yes, it would make it stronger."

*the defendant* was a seller or user. It is permissible, however, for the state to ask the expert whether the items seized are commonly used by drug dealers generally. Therefore, under *Vilalastra,* it is improper to solicit a particularized opinion as to the defendant's use and possession of items or drugs found; however, it is wholly appropriate to inquire into the custom and practice of narcotics traffickers generally.

The court in *Vilalastra,* supra, provided a number of examples of permissible inquiry which are helpful in understanding the distinction. "Expert witnesses may testify that certain behavior by a defendant or his possession of particular items is conduct similar to that engaged in by the typical drug dealer." Id., 45. In addition, "[a] police officer, who is qualified as an expert witness, may . . . testify that, in light of the officer's personal observations of [the defendant's] conduct, it appeared that a defendant was engaged in narcotic sales." Id. Furthermore, it is proper for the state's attorney to ask the police officer whether, in his expert opinion it is the common practice of drug sellers, to work with the items found. Id. An expert may give his opinion about the quantity of narcotics that a drug dealer might possess. Id., 42. By contrast, the state's attorney may not ask "[w]hether or not the items found . . . were possessed for either personal use and consumption or with intent to sell or dispense." Id., 43.

The defendant argues that although some of the questions do not appear to be improper under *Vilalastra,* they are improper, when viewed individually, and examined in the respective nature and manner in which they were asked. We find this argument unpersuasive. The questions posed to the witness by the state, and allowed by the court, satisfied the standard set forth in *Vilalastra.* The state did not ask the witness a question framed to elicit a response that the items seized conclusively established that the defendant was a drug

seller or that invited the witness to improperly specu-
late that the items seized were conclusively possessed
for either consumption or sale. Each question sought
permissible answers as to whether the items seized
were those commonly used by drug dealers. The wit-
ness never expressed his opinion as to the ultimate issue
of intent or that the defendant was either a user or a
seller of narcotics. We conclude, therefore, that the
state's inquiry was proper.

### III

The defendant next claims that the court erred in
admitting the hearsay statements of the declarant,
Sonya Hernandez, during the testimony of Officer Jose
Morales. Morales was permitted to testify, over the
defendant's objection, regarding statements Hernan-
dez made after she was arrested.[8] The trial court ruled
that the testimony was admissible under the coconspi-
rator exception to the hearsay rule. Although the state
concedes that Morales' testimony was inadmissible
under this exception because the statements were not
made in furtherance of a conspiracy; see State v. Ves-
sichio, 197 Conn. 644, 500 A.2d 1311 (1985), cert.
denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d
187 (1986); it argues that the error was harmless

---

[8] The pertinent portion of Morales' testimony is as follows:

"A. Again she stated that she had gone, she was approached at Pizza
Gormet, which is a pizza shop approximately a block away from where we
were, and she was met by a black male who gave her a pyramid paper to
bring over to the car and that he was going to pay her 10 dollars and that
he suppose—she was supposed to get one hundred dollars from the indi-
vidual that was in the blue car, which was Detective Mike Manzi.

"Q. And after she told you this, what, if anything, occurred?

"A. Then she said that the black male was approximately 3 to 4 cars
behind us.

"Q. And did she describe the car?

"A. Yes, she described the car.

"Q. And what was that description, if you recall?

"A. Dark color, small compact car, Subaru of some type."

because the evidence was merely cumulative of Hernandez' own testimony concerning the same events. Since the error is evidentiary, the defendant bears the burden of establishing that the error was harmful. *State v. Januszewski,* 182 Conn. 142, 174, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981).

The defendant concedes that Morales' testimony was cumulative. He argues, however, that Morales' testimony was far more damaging to his case than that given by Hernandez herself because as a police officer, Morales' testimony had a greater aura of truth to it. We find this argument unpersuasive. The trial court charged the jury that the testimony of a police officer is not to be given greater weight than the testimony of any other witness and is to be scrutinized in the same manner as any other witness. We presume that the jury follows the instructions as presented to them. *State v. Cavros,* 196 Conn. 519, 528, 494 A.2d 550, cert. denied, 474 U.S. 904, 106 S. Ct. 233, 88 L. Ed. 2d 232 (1985).

" 'An erroneous ruling should not be considered reversible error if the evidence admitted thereby has already properly entered the case.' " *State v. Dolphin,* 195 Conn. 444, 455, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985), quoting *State v. Randolph,* 190 Conn. 576, 589–90, 462 A.2d 1011 (1983). Although it was error to permit this evidence under the coconspirator exception to the hearsay rule, we conclude that the error was harmless. See *State v. Fiocchi,* 17 Conn. App. 326, 338–39, 553 A.2d 181 (1989).

## IV

The defendant's fourth claim is that the trial court violated his state and federal[9] constitutional right to

---

[9] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers, and possessions from

be free from unreasonable warrantless searches in denying his motion to suppress certain evidence seized from the trunk of his car. The trial court found that the items were properly seized under the inventory exception to the warrant requirement. We agree with the trial court.

The following facts were established during the evidentiary hearing on the defendant's motion to suppress. When the defendant was arrested, his vehicle was parked near a busy intersection on the corner of Park and Lafayette Streets in Hartford. Manzi testified that the arrest occurred at approximately 4:15 p.m. during rush hour traffic. As the arrest was occurring, a large crowd gathered. When the detective conducted a pat-down search of the defendant for weapons, he felt a hard object in the defendant's pocket which turned out to be a message center beeper. The search of the car incident to the arrest uncovered a ziplock type bag containing white powder which was in a compartment on the driver's door. After the officers took the defendant to police headquarters, they notified a private towing company to remove the defendant's car from the street. The vehicle was towed to the Morgan Street police station and was subjected to a routine inventory search. A search of the trunk of the car

unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ."

Although the defendant refers to both the state and federal constitutions, he offers no separate analysis of the Connecticut constitution as the basis for different treatment of the state and federal claims. In light of this briefing failure, we decline to undertake such an analysis and therefore analyze his claim under the federal standard. *State* v. *Bowden,* 15 Conn. App. 539, 543 n.2, 545 A.2d 591, cert. denied, 209 Conn. 810, 548 A.2d 438 (1988).

uncovered a .38 caliber handgun, and a Deering narcotics kit which included a scale and other drug paraphernalia. When asked whether the impoundment and search were conducted pursuant to established police procedures, Manzi testified that it is routine practice to impound vehicles incident to an arrest and that in conducting the search he used a standardized state form.

Because it is uncontested that the search of the defendant's car at police headquarters was performed without a search warrant, and therefore was per se unreasonable; *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); in order to uphold this search, the state must demonstrate that the warrantless search was nevertheless reasonable under one of the recognized exceptions to the warrant requirement. *State* v. *Badgett,* 200 Conn. 412, 423–24, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); *State* v. *Murphy,* 6 Conn. App. 394, 396, 505 A.2d 1251 (1986). The principal theory put forth by the state is that the warrantless search was the product of a routine inventory of the contents of the defendant's vehicle. The United States Supreme Court has approved routine inventory searches of motor vehicles performed for purposes other than investigation and pursuant to standardized police procedures. *South Dakota* v. *Opperman,* 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976).

"In order to determine the reasonableness of a routine inventory search, a court is required to weigh 'the governmental and societal interests advanced to justify such intrusions against the constitutionally protected interest of the individual citizen in the privacy of his effects.' " *State* v. *Murphy,* supra, 397, quoting *South Dakota* v. *Opperman,* supra, 378. "In applying this balancing test, the Supreme Court identified three governmental and societal interests [that] support . . .

inventory searches: (1) protection of the police from danger; (2) protection of the police against claims and disputes over lost or stolen property; and (3) protection of the owner's property while it remains in police custody. *South Dakota* v. *Opperman,* supra, 369. When these interests singly or together comprise the reason for invading a citizen's expectation of privacy in his automobile, the Supreme Court has concluded that the limited intrusion into an individual's privacy interest caused by an inventory search is outweighed by the legitimate governmental interests embodied in the 'community caretaking functions' of the police. Id., 368–69; *Cady* v. *Dombrowski,* 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973); see also *State* v. *Tully,* supra, 136–37." *State* v. *Murphy,* supra, 397–98. "Whether a search is reasonable is to be determined on a case by case basis, depending upon the particular fact situation." *State* v. *Murphy,* supra, 400, citing *South Dakota* v. *Opperman,* supra, 373.

The defendant argues that the inventory search of his vehicle was improper for a number of reasons. First, the defendant asserts that the car should not have been impounded because there was no evidence that it was illegally parked or that he had expressed concern for securing its contents. The absence of such evidence does not necessarily render impoundment improper. The trial court expressly found, on the basis of Manzi's uncontradicted testimony, that the reason for towing the defendant's car was to remove it from a busy public street and, in light of the fact that a crowd had gathered during the course of the defendant's arrest, to avoid vandalism and theft. We find persuasive a recent federal case that explicitly found that the impoundment and towing of an arrestee's car from a public parking lot was reasonable. *United States* v. *Frank,* 864 F.2d 992 (3rd Cir. 1988). The facts of the present case are even more compelling than those pre-

sented in *Frank,* supra. In this case, the defendant's car was left on a busy public street during rush hour traffic. Moreover, in light of the volatile nature of the neighborhood where the car was left, by securing the property the police were protecting it from any theft or vandalism; a reason expressly recognized in *Colorado* v. *Bertine,* 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987). Under these circumstances, the decision to impound the vehicle and inventory its contents was reasonable. The fact that a defendant does not express concern for its vehicle or contents does not affect this result.

The defendant also asserts that the inventory search of his car was unreasonable because he should have been permitted to make arrangements to move his car by other means. In support of this argument, the defendant relies on *State* v. *Murphy,* supra. For a variety of reasons, such reliance is misplaced. First, *Murphy* is factually distinguishable from the present case. In *Murphy,* this court held that under the federal and state constitutions an inventory search of a car conducted on the street was unreasonable when the defendant requested to make his own arrangements to tow his car one and one-half miles to his residence. In this case, no such request was made by the defendant. Moreover, to the extent that *State* v. *Murphy,* supra, relied on the federal constitution in finding the search in that case unreasonable, its holding is overruled by *Colorado* v. *Bertine,* supra, which was decided after *Murphy.* Although the defendant made no request to move his car, he nevertheless argues that under the circumstances presented here, he "could" have made other arrangements. The defendant appears to be arguing that the police should have asked him if he wished to make such arrangements. The theory that the police must use the "least intrusive" means possible, which was adopted by this court in *Murphy,* supra, was

expressly rejected in *Colorado* v. *Bertine,* supra. In *Bertine,* the court found that "while giving [the defendant] an opportunity to make alternative arrangements would undoubtedly have been possible . . . '[t]he real question is not what "could have been achieved," but whether the Fourth Amendment *requires* such steps . . . the reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative "less intrusive" means.' (Emphasis in original.) [*Illinois* v. *Lafayette,* 462 U.S. 640, 647, 103 S. Ct. 2605, 77 L. Ed. 2d (1983)]. . . . [R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts must as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." *Colorado* v. *Bertine,* supra, 373–74. Therefore, the touchstone under the federal standard is the "reasonableness" of the search. In light of this pronouncement in *Bertine,* the defendant's argument that he should have been allowed to make other arrangements to tow his car is without merit.

The defendant's final challenge to the inventory search is that it was not conducted pursuant to a formal written policy. *United States* v. *Opperman,* supra, 366, mandates that an inventory search be conducted "using a standard inventory form pursuant to standard police procedures." The reason for requiring such procedures is to avoid arbitrary determinations by police with respect to an inventory search. Id., 383. While it is clear that a search must be conducted according to established procedures, neither *Opperman,* nor any subsequent case, expressly requires such procedures to be written. See *United States* v. *Frank,* supra.

The record discloses that Manzi testified that it is the policy of the Hartford police department to impound cars upon the driver's arrest. Manzi explained that the

impoundment of the car was necessary in this case because the car was parked on a busy street and in a volatile neighborhood. In addition, he testified that he conducted the search pursuant to the department's policy and utilized a standard form in doing so. We find that under the federal standard this was sufficient. We conclude, therefore, that the trial court did not err in denying the defendant's motion to suppress.

## V

The defendant's fifth claim challenges the trial court's denial of his motion to reopen so that he could testify on his own behalf. On July 31, 1987, the defense rested its case without calling any witnesses or presenting any evidence. On August 3, 1987, the next court date, the defendant moved to reopen his case. In the absence of the jury, defense counsel claimed that over the weekend he had learned from the defendant about an affidavit that Hernandez had allegedly signed recanting her previous testimony. The defendant explained that he sought to reopen his case for the purpose of recalling Hernandez and calling the defendant to testify about this alleged statement. The trial court conducted a preliminary hearing, during which Hernandez took the stand, but invoked her fifth amendment right against self-incrimination to all questions pertaining to her previous trial testimony and to the alleged affidavit. The defendant then requested that he be permitted to recall Hernandez to the stand and permit her to invoke her fifth amendment privilege in front of the jury. This request was denied on the basis that her testimony was ambiguous, nonprobative, highly prejudicial and untrustworthy. The defendant did not pursue his request that he be allowed to testify.

The defendant does not challenge the court's ruling as to Hernandez, and we therefore decline to address

this issue. Instead, he claims that the trial court erred in denying his request to reopen so that he could testify on his own behalf.

It is well established that a trial court enjoys wide discretion in permitting the reopening of a case after either side has rested. *State* v. *Anderson,* 209 Conn. 622, 634, 553 A.2d 589 (1989); *State* v. *Allen,* 205 Conn. 370, 380, 533 A.2d 559 (1987). This request to reopen involves the defendant's constitutional right to present evidence. "The sixth amendment has been said to include 'a compact statement of the rights necessary to a full defense' which is part of the fourteenth amendment guarantee of due process of law. *Faretta* v. *California,* 422 U.S. 806, 818, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). One of these rights is 'to offer testimony . . . '; see *Washington* v. *Texas,* 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); 'through the calling and interrogation of favorable witnesses . . . .' *Faretta* v. *California,* supra. . . . 'For a court's refusal to reopen and receive new evidence after the parties have rested to constitute a sixth amendment violation . . . greater prejudice must be shown than in refusals to receive evidence offered in the regular course of a trial. . . . [A] trial judge must be allowed a fair degree of discretion in ruling upon motions to reopen the defense. And for his adverse ruling to violate the sixth amendment, it must be shown that the proffered evidence was of such importance to the achievement of a just result that the need for admitting it overrides the presumption favoring enforcement of the state's usual trial procedures. . . . ' *Blaikie* v. *Callahan,* 691 F.2d 64, 67–68 (1st Cir. 1982)." *State* v. *McKnight,* 191 Conn. 564, 580, 469 A.2d 397 (1983). "If the motion to reopen is denied, we must, in determining whether the trial court abused its discretion, look to see if an injustice has occurred by the omission of the evidence." *State* v. *Anderson,* supra, 635. In

reviewing the claimed error, we will give every reasonable presumption in favor of the correctness of the court's ruling. Id., 635.

The trial court was not presented with any circumstances that would justify the reopening of the defendant's case. While the defendant did not proffer the exact nature of his testimony, he did state that he wished to explain the circumstances surrounding the newly discovered evidence. The fact that he did not request to take the stand after the court ruled Hernandez' testimony was inadmissible, demonstrates that the defendant's only purpose in testifying involved Hernandez' testimony. His testimony would only be relevant, however, if Hernandez testified. Because the defendant does not challenge the court's ruling with respect to Hernandez, it is unnecessary for us to review it. We conclude, therefore, that the court did not abuse its discretion in denying the motion to reopen.

## VI

The defendant's final claim is that the trial court erred in instructing the jury that the defendant could be convicted of violating General Statutes § 21a-278 (b) if it found that he "dispensed, distributed or transported" cocaine. The defendant, however, did not raise an objection to this portion of the charge at trial nor does he even argue that his claim is reviewable under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). In addition, in support of his claim the defendant merely states this issue without presenting this court with any legal analysis whatsoever. In light of these briefing failures, we decline to review this claim. Practice Book §§ 4183 and 4185; see *State* v. *Smith,* 209 Conn. 423, 551 A.2d 742 (1988); *State* v. *Maisonet,* 16 Conn. App. 89, 97, 546 A.2d 951 (1988); *State* v. *Fiocchi,* supra, 327–28 n.3.

There is error only as to the judgment of conviction of having a weapon in a motor vehicle, that judgment is set aside and the case is remanded with direction to render a judgment of not guilty on that count.

In this opinion the other judges concurred.