### STATE OF CONNECTICUT *v.* HARTLEY ANDERSON
### (13112)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and COVELLO, Js.

Argued November 9, 1988—decision released January 24, 1989

*Timothy P. Pothin,* with whom were *Jonathan J. Einhorn* and, on the brief, *Gabriel H. Cusanelli,* for the appellant (defendant).

*Julia DiCocco Dewey,* assistant state's attorney, with whom were *Lawrence Daly,* assistant state's attorney, and, on the brief, *Christine Marsching,* legal intern, for the appellee (state).

CALLAHAN, J. The defendant, Hartley Anderson, was convicted after a jury trial of murder in violation of General Statutes § 53a-54a.[1] He appeals from the judgment of the trial court sentencing him to a forty-five year term of imprisonment. On appeal, the defendant maintains that he was deprived of a fundamental constitutional right and a fair trial by the admission into evidence of statements that he claims were elicited in violation of his rights under the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. He also claims that the trial court abused its discretion in denying his motion to "reopen." We find no error.

The jury could reasonably have found the following facts. On May 6, 1985, at approximately 1:20 p.m., Edmund and Leslie Joyner drove their automobile into the parking lot of Bill's Liquor Locker in East Windsor. The only other vehicle in the package store parking lot at that time was a blue Ford Mustang later identified as the defendant's. When the brothers exited their vehicle and approached the liquor store, they

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

heard a woman scream several times. Concerned, the Joyners hurried toward the store. As they were about to enter, the defendant ran past them out of the building. His clothes and hands were covered with blood. At about the same time, through the open door of the store, the Joyners glimpsed the victim lying on the floor in a pool of blood. The Joyners then turned and chased the defendant to a parking area at the rear of the store. There the defendant stopped and faced his pursuers. At that point Leslie asked him who he was, to which inquiry the defendant replied, "nobody." Thereafter, in fear that the defendant was armed, the Joyners retreated inside the store.

Once in the store, Leslie called the police and Edmund attended to the victim, the proprietress of the store, who had been repeatedly stabbed but was still conscious. While waiting for the police, Edmund observed the defendant enter his car and drive rapidly away. Before the defendant left the area, however, Edmund managed to write his automobile registration number on the back of a lottery ticket. Returning to the victim, Edmund asked who had stabbed her and, although she was having trouble communicating, she replied, "a regular customer." When the police arrived, Edmund gave them the license plate number he had recorded along with a description of the defendant's car and the clothing he was wearing. The victim, Sharon Ruggiero, died en route to a nearby hospital.

The defendant was arrested at his home less than one hour after he left the liquor store. At the time of his arrest, he had cuts on his face, lip, neck and hand. These cuts were fresh but were not then bleeding. The defendant's clothes, hands and forearms, however, were stained with blood. At the time of his apprehension the defendant was wearing, with the exception of his coat, clothes similar to those Edmund Joyner had described to the police. Also a search of the defendant's trouser

pockets, incident to his arrest, uncovered a bloodstained receipt from Bill's Liquor Locker. Thereafter, during a search of the defendant's house, the investigating officers found droplets of blood, bloodstains and smudges in several areas including the hallway, attic stairs and bathroom. In addition, they discovered a bloodstained T-shirt in the master bedroom and a bloodstained handkerchief in the living room. At the house the police officers also seized an empty leather knife case. Finally, a wet, bloodstained coat belonging to the defendant was found in his attic hidden under insulation and rafters.

At trial, evidence was introduced to show that the defendant was, in fact, a regular customer at Bill's Liquor Locker. Further, Officer Raymond Fahey of the East Windsor police department, an acquaintance of the defendant, testified that as he was on his way to Bill's Liquor Locker in response to an emergency call, he saw the defendant driving away from the homicide scene. Moreover, bloody fingernail scrapings were secured by the police after the defendant's arrest and the defendant's bloody fingerprint was found on the door of the liquor store. The defendant's blood was found on the victim's shoes and there were bloodstains discovered in his car.

The defendant first claims that his constitutional rights were violated by the admission into evidence of the testimony of State Police Detective Ronald Ruel. Ruel testified that during interrogation he asked the defendant whether he had assaulted anyone. In reply, the defendant stated that he did not recall but then clenched his fists and said that if he had, "I would have used these." Similar statements were made by the defendant when he was asked whether he remembered hurting anyone. According to Ruel's testimony, when the defendant was asked whether he killed anyone, he became very angry and again stated that if he had he would have done it with his fists or his car. In addi-

tion, Ruel testified that the defendant stated to him "that it's not unusual for him to drink a case [of beer] or more in one day; and that it doesn't really affect him that much." The defendant claims that these statements should have been excluded at trial because he did not waive his right to counsel and the statements were elicited from him by police officers after he had requested an attorney on two separate occasions.[2]

Initially, we note that the defendant failed to raise this claim at trial either by way of an objection to the admission of Ruel's testimony or a motion to suppress any statement he made to Ruel. While we do not generally entertain claims not raised below, we have recognized "two situations that may constitute 'exceptional circumstances' such that newly raised claims can and will be considered by this court." *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). One of the two " 'exceptional circumstance[s]' may arise where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." Id. Accordingly, we must review the record to determine whether it is adequate for consideration of the defendant's constitutional claim.

The defendant contends that he asserted a desire to speak with an attorney, first to Chief Thomas Laufer of East Windsor while he was being transported to East Windsor police headquarters, and then to State Police Detectives Ruel and George Heg prior to being interrogated by them. It is axiomatic at this point in time

---

[2] Ruel also testified that the defendant called his wife and was heard to say that "the cops are saying that I killed someone. Can you go out and check my car, see if there's any damage?" The defendant argues that the admission into evidence of this statement also denied him a fair trial. Since the statement was not elicited by the police during interrogation, however, the defendant's claim is baseless. *Rhode Island* v. *Innis,* 446 U.S. 291, 298, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *State* v. *Vitale,* 197 Conn. 396, 409–12, 497 A.2d 956 (1985); *State* v. *Stankowski,* 184 Conn. 121, 136, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981).

that "[a]n accused in custody, 'having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,' unless he validly waives his earlier request for the assistance of counsel. *Edwards* v. *Arizona,* 451 U.S. [477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981)]." *Smith* v. *Illinois,* 469 U.S. 91, 94–95, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984).

Whenever there is a question as to whether the accused actually requested counsel, a factual inquiry is required to determine whether he attempted to invoke a *present* right to counsel; *United States* v. *Jardina,* 747 F.2d 945, 949 (5th Cir. 1984), cert. denied, 470 U.S. 1058, 105 S. Ct. 1773, 84 L. Ed. 2d 833 (1985); see also *Bruni* v. *Lewis,* 847 F.2d 561, 563 (9th Cir.), cert. denied, U.S. , 109 S. Ct. 1319, 102 L. Ed. 2d 391 (1988); and whether his asserted request was unambiguous or unequivocal. *Smith* v. *Illinois,* supra, 95; *United States* v. *Gotay,* 844 F.2d 971, 975 (2d Cir. 1988); *United States* v. *Fouche,* 776 F.2d 1398, 1405 (9th Cir. 1985), cert. denied, U.S. , 108 S. Ct. 1756, 100 L. Ed. 2d 218 (1988); *State* v. *Acquin,* 187 Conn. 647, 672–77, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). Although the United States Supreme Court has not defined ambiguity in this context or ruled on the consequences of such ambiguity, the trend among the federal courts that have considered the problem is that all questioning need not stop as soon as the word "lawyer" or "attorney" is mentioned. *United States* v. *Gotay,* supra; see also *Bruni* v. *Lewis,* supra, 564; *United States* v. *Jardina,* supra (mere mentioning of the word "attorney" does not constitute a request for counsel . . . "[t]he word 'attorney' has no talismanic qualities"). Rather, if "a suspect makes an equivocal statement that arguably

can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel." *United States v. Gotay,* supra; see also *Bruni v. Lewis,* supra, 563–64; *Nash v. Estelle,* 597 F.2d 513, 517 (5th Cir.), cert. denied, 444 U.S. 981, 100 S. Ct. 485, 62 L. Ed. 2d 409 (1979). This rule has been adopted by this court. *State v. Acquin,* supra. "Under this approach, questions aimed at clarifying a request must be strictly limited to that purpose and may not be used to elicit incriminating information . . . ." *United States v. Gotay,* supra; *Nash v. Estelle,* supra; see also *State v. Acquin,* supra. "[I]f the clarification reveals that the suspect wants counsel, interrogation must cease until counsel is provided. If . . . the clarification 'reveals that the suspect does not want counsel, the interrogation may continue.' " *United States v. Nordling,* 804 F.2d 1466, 1470 (9th Cir. 1986); *United States v. Fouche,* supra; see also *United States v. Gotay,* supra. "A police initiated conversation after an equivocal request for counsel does not automatically void a subsequent confession if the police questions are fairly designed to clarify the ambiguity." *United States v. Fouche,* supra; see also *United States v. Nordling,* supra, 1470–71. "However, the police may not use a statement a suspect makes after an equivocal request for counsel, but before the request is clarified as an effective waiver of the right to counsel. [*Thompson v. Wainwright,* 601 F.2d 768, 771–72 (5th Cir. 1979)]." *United States v. Fouche,* supra; see also *United States v. Gotay,* supra.

If an accused does invoke his right to counsel, "courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. *Edwards v. Arizona,* supra, at 485, 486, n.9." *Smith v. Illinois,* supra, 95; see also

*State* v. *Gray,* 200 Conn. 523, 533, 512 A.2d 217, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). Whether the defendant made a knowing and intelligent waiver is a question of fact to be determined by an examination of " 'the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.' " *Edwards* v. *Arizona,* supra, 482; *State* v. *Gray,* supra; *State* v. *Williams,* 190 Conn. 104, 112, 459 A.2d 510 (1983); *State* v. *Acquin,* supra, 666.

The only evidence concerning the defendant's first request for counsel is the testimony of Chief Laufer. Laufer testified that when the defendant was arrested at his home he was read his *Miranda* rights at which time he indicated that he understood them. Thereafter, the defendant was transported by Laufer to East Windsor police headquarters. According to Laufer's testimony, during the drive the defendant initiated a conversation with him and asked him why he had been arrested. When Laufer explained to the defendant that he had been seen running out of Bill's Liquor Locker with blood on him, the defendant denied any knowledge of the incident. When the defendant inquired further, Laufer again explained what had been observed, and at that point the defendant, according to Laufer, "indicate[d] that he better call his wife and lawyer." Laufer, who was a witness for the defense, was not asked to explain how the defendant "indicated" he had better call a lawyer or whether the defendant "indicated" an intention to call a lawyer immediately or in the future or before or after he had talked to the police. The defendant shed no light on the subject because in his testimony he did not claim he gave any such indication to Laufer nor did he allude in any way to an expressed desire to consult an attorney. In short, we are unable to tell from the record whether the defendant's indication that "he better call his wife and law-

yer" was an unequivocal request that invoked his present right to counsel and that would prohibit further inquiry by the police as to his desires and intentions in that regard.

The defendant's second alleged request for an attorney occurred approximately three hours after the defendant was arrested, just prior to his interrogation by Detectives Heg and Ruel. In his direct testimony at the defendant's trial, Ruel described the exchange concerning the request as follows:

"Q. Now, as to the form with which you were concerned, what happened in that procedure?

"A. He read each individual sentence aloud and signed his letters next to each line. And on the bottom of the form he signed his complete signature.

"Q. When you say he signed his letters, do you mean the initials in his name?

"A. That's correct.

"Q. Now, besides or in addition to the initials in his name, did he put anything else on that form, if you recall?

"A. Yes. On one of the lines he stated that he would want a lawyer.

"Q. And did you question him at all about his wanting a lawyer?

"A. Yes, I did. And—

"Q. Do you remember what you said to him?

"A. I asked him if he wanted to call a lawyer.

"Q. And what did he say?

"A. And he said he may want to do that, but he wished to speak to us about his activities of that whole day.

"Q. Okay. When he indicated that he may want to, but he wanted to speak to you about his activities of that whole day, was that before or after or during the time that you were involved with him with this form?

"A. That was during that time.

"Q. What did he do then, as concerns the balance of that form?

"A. He completed the form, after making that written statement about wanting a lawyer. And he completed the form and put his signature at the bottom of that form, completing it."[3]

On cross-examination, Ruel recapitulated his description of his meeting with the defendant in the following manner:

"Q. Now, you testified that you had advised him of his rights and he had made reference to obtaining the services of a lawyer; is that correct?

"A. That's correct.

"Q. But he did agree to talk with you, didn't he?

"A. That's correct.

"Q. Without any lawyer being present.

"A. Correct."

Heg described his encounter with the defendant concerning this issue as follows:

---

[3] The form to which Ruel apparently referred is in the trial court file. Although it displays the defendant's signature on the bottom as Ruel testified, it is not initialed after each right nor does it contain any written request for an attorney.

"Q. And he initialed the block showing that he had read each sentence, each of which contains a specific right; is that correct?

"A. Yes, sir.

"Q. And, in fact, in the one that talks about the attorneys, he indicated that he might want an attorney; is that correct?

"A. Yes, sir.

"Q. But first he wanted to talk to you.

"A. That's correct."

When the defendant testified, he was not asked about his alleged request for counsel prior to speaking to Ruel and Heg nor did he claim in his testimony that he made any such request.

On appeal, the defendant claims that this seemingly inconsistent, conflicting record is sufficient to show that after he had twice unequivocally requested counsel he was questioned by police officers while he was in custody. He argues that he consequently was deprived of a fundamental constitutional right and a fair trial. We disagree. "This court has no constitutional jurisdiction to decide disputed issues of fact." *State* v. *Wilson,* 199 Conn. 417, 438, 513 A.2d 620 (1986); see also *State* v. *Lafferty,* 189 Conn. 360, 363, 456 A.2d 272 (1983). On the basis of the undeveloped state of the record in this case, we cannot, without becoming factfinders, determine that the defendant unequivocally and unambiguously requested an attorney, so as to preclude further inquiry in that regard, either in Chief Laufer's car or prior to his interrogation by Detectives Ruel and Heg, nor can we determine whether there was a valid waiver of his right to counsel prior to his interrogation by Ruel and Heg. Accordingly, we are unable to say that the defendant has suffered a clear deprivation of a fun-

damental constitutional right. "The defendant has an obligation to supply this court with a record adequate to review his claim of error." *State* v. *Crumpton,* 202 Conn. 224, 231, 520 A.2d 226 (1987); *State* v. *Tyler-Barcomb,* 197 Conn. 666, 676, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986); *State* v. *Thompson,* 197 Conn. 67, 81, 495 A.2d 1054 (1985). Had the defendant objected to the detective's testimony at trial or moved to suppress it on the ground he now claims, a hearing or questioning would have provided a factual basis for his claim and the record would have been properly preserved. See *State* v. *Plourde,* 208 Conn. 455, 463, 545 A.2d 1071 (1988); *State* v. *Rodgers,* 207 Conn. 646, 653-54, 542 A.2d 1136 (1988); *State* v. *Tyler-Barcomb,* supra, 675-76; *State* v. *Flinter,* 16 Conn. App. 402, 411, 548 A.2d 1 (1988). It was not.

Moreover, it is difficult to understand how the defendant can now claim that he was deprived of a fair trial. It is evident that at the time of trial he was aware of the factual situation that he now argues requires the exclusion of his statements. The defendant, however, elected not to file a motion to suppress his statements or to object to their admission. Rather, he permitted this testimony to come before the jury without challenge. Apparently he followed this course to bolster his trial strategy which was to appear to have been cooperative with the police at the time of his arrest. The defendant cannot now claim "foul" because of the admission of evidence which he allowed in for tactical purposes. *State* v. *Marino,* 190 Conn. 639, 655, 462 A.2d 1021 (1983); *State* v. *Moye,* 177 Conn. 487, 497-98, 418 A.2d 870, vacated, 444 U.S. 893, 100 S. Ct. 1996, 62 L. Ed. 2d 129, on remand, 179 Conn. 761, 409 A.2d 149 (1979); see also *State* v. *Scognamiglio,* 202 Conn. 18, 25, 519 A.2d 607 (1987); *State* v. *Ross,* 189 Conn. 42, 47, 454 A.2d 266 (1983); *State* v. *Kish,* 186 Conn.

757, 769, 443 A.2d 1274 (1982); *State* v. *Cobbs,* 164 Conn. 402, 424, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973) (an appellant cannot ordinarily claim error in the action of the trial court which he has induced). Because the record does not adequately support the defendant's claim that he was deprived of a fundamental constitutional right and a fair trial, we decline to review it.

The defendant's second claim on appeal is that the trial court abused its discretion when, after he had rested, it denied his motion to "reopen" which, if granted, would have allowed him to present the testimony of a psychiatrist, Alfred Herzog, who had hypnotized him on three occasions in an attempt to help him recall his activities on the day of the murder. According to the defendant, Herzog's testimony was crucial to his case because it would have provided the jury with the doctor's diagnosis that the defendant was suffering from psychological amnesia. The defendant argues that his inability to present this testimony to the jury deprived him of both a fair trial and his right to establish a defense as guaranteed by the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of the state of Connecticut. We disagree.

As the defendant concedes, " ' "[t]he reopening of a criminal case either to present omitted evidence or to add further testimony after either of the parties has rested is within the sound discretion of the Trial Court. . . ." ' " *State* v. *Brigandi,* 186 Conn. 521, 545, 442 A.2d 927 (1982); see also *State* v. *Zayas,* 195 Conn. 611, 622–23, 490 A.2d 68 (1985) (*Healey, J.,* dissenting); *State* v. *McKnight,* 191 Conn. 564, 580, 469 A.2d 397 (1983); *State* v. *Holmquist,* 173 Conn. 140, 152, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977). If the trial court finds that

" 'inadvertence or some other compelling circumstance . . . justifies a reopening and no substantial prejudice will occur,' " it is vested with the discretion to reopen the case. *State* v. *Brigandi,* supra, 546; see also *State* v. *McKnight,* supra; *State* v. *Holmquist,* supra. It must be shown, however, " 'that the proffered evidence was of such importance to the achievement of a just result that the need for admitting it overrides the presumption favoring enforcement of the state's usual trial procedures.' " *State* v. *McKnight,* supra. A " 'greater prejudice must be shown [by the omission of the evidence in question] than in refusals to receive evidence offered in the regular course of a trial. . . .' " Id.; *Blaikie* v. *Callahan,* 691 F.2d 64, 67–68 (1st Cir. 1982). If the motion to reopen is denied, we must, in determining whether the trial court has abused its discretion, look to see if an injustice has occurred by the omission of the evidence. *State* v. *McKnight,* supra; *State* v. *Holmquist,* supra. However, " 'every reasonable presumption should be given in favor of the correctness of the court's ruling. . . .' " *State* v. *Holmquist,* supra; *DiPalma* v. *Wiesen,* 163 Conn. 293, 298, 303 A.2d 709 (1972).

With these standards in mind we have reviewed the circumstances attending the trial court's refusal to allow the defendant to "reopen" his case after he had rested. We are confident as a result of that review that the trial court's action did not result in an injustice and was not an abuse of the broad discretion accorded it in this area.

There is no error.

In this opinion the other justices concurred.