[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED SEPTEMBER 19, 1995
I. INTRODUCTION
Between June 4, 1992 and August 18, 1994, a series of acts of vandalism occurred in and around the towns of Haddam and Killingworth. A number of charges, arising out of six of these incidents, are currently pending against the defendant, David Saraceno. Said incidents, along with their corresponding docket numbers, are as follows:
On or about June 4, 1992, a public phone receiver was intentionally damaged by the use of an aluminum baseball bat. The defendant has been charged with this crime, as well as with conspiracy to commit this crime, at D.N. 132674. On or about June 28, 1994, a glass plate window at Haddam-Killingworth High School was intentionally broken by the use of an aluminum baseball bat. The defendant has been charged with the commission of this crime at D.N. 132672.
On or about August 16, 1994, a wooden street sign was intentionally damaged, in that someone attempted to light it on fire. The defendant has been charged with CT Page 9954 this crime, as well as with conspiracy to commit this crime, at D.N. 132675. Finally, on August 25, 1994, during the execution of a search and seizure warrant at the defendant's residence, three street signs were seized. The defendant has been charged with the unlawful taking of these signs at D.N. 132673.
In addition to the aforementioned incidents, on or about August 16, 1994, the defendant was allegedly involved in the destruction of a 1991 GEO Storm motor vehicle by setting it on fire by the use of a "molotov cocktail." Here again, the defendant is alleged to have conspired with Keith Thompson as well as Damon Dombroski in the commission of this crime. As a result, the defendant has been charged, at D.N. 130274, with: arson in the second degree, in violation of General Statutes § 53a-112; conspiracy to commit criminal mischief in the first degree, in violation of General Statutes §§ 53a-48 and 53a-115; criminal mischief in the first degree, in violation of General Statutes § 53a-115; conspiracy to manufacture bombs, in violation of General Statutes §§ 53a-48 and 53a-80a; manufacture of bombs, in violation of General Statutes § 53a-80a; conspiracy to commit arson in the second degree, in violation of General Statutes §§ 53a-48 and 53a-112; conspiracy to commit tampering with a motor vehicle, in violation of General Statutes §§ 53a-48 and 53a-119b; and tampering with a motor vehicle, in violation of General Statutes § 53a-119b.
Further, on or about the early morning hours of August 18, 1994, the defendant was allegedly involved in the total or partial destruction of a number of school buses on the Haddam-Killingworth High School premises. Such destruction was achieved by intentionally setting fire to two buses located at two different points among a row of school buses. The defendant again allegedly conspired with both Keith Thompson and Damon Dombroski in the commission of this crime. As a result, the defendant has been charged, at D.N. 130425, with conspiracy to commit all counts, in violation of General Statutes § 53a-48; arson in the first degree, in violation of General Statutes § 53a-111; burglary in the third degree, in violation of General Statutes § 53a-103; criminal trespass in the third degree, CT Page 9955 in violation of General Statutes § 53a-109; and criminal mischief in the first degree, in violation of General Statutes § 53a-115.
On April 17, 1995, the defendant filed a motion to suppress a confession that he allegedly gave to the police during the evening hours of August 25, 1994, and the early morning hours of August 26, 1994, regarding two of the above-described incidents. Said incidents include those matters found at Docket Numbers 130274 (the bombing of the car) and 130425 (the burning of the buses). Record, at 1. Accordingly, the following decision, concerning the defendant's motion to suppress, addresses only these two incidents. All other charges against the defendant, as set forth above, remain unaffected by this decision.
II. EVIDENCE PROFFERED AT THE SUPPRESSION HEARING
On May 30 and 31, 1995, and on June 1 and 2, 1995, a hearing regarding the defendant's motion to suppress was held before the court (Walsh, J.). During said hearing, the following essential facts were proffered.
On August 25, 1994, at approximately 3:30 p. m., a search warrant was executed by the Connecticut State Police at the defendant's home. Record: Police Report, dated August 28, 1994, ("Report"), at 1; Testimony of Detective Reinaldo Ortiz ("Ortiz"), at 5-6; Testimony of Detective James Thomas ("Thomas"), at 100; Testimony of Lieutenant (formerly Sergeant) Scott Martin ("Martin"), at 77-78. At this same time, the defendant was also arrested by warrant, handcuffed, and read his Miranda rights. Record: Report, at 1; Ortiz, at 6-8; Thomas, at 100-01; Martin, at 78; Saraceno, at 74-76, 126. When asked by Detective Thomas whether he understood his rights, the defendant responded in the affirmative. Record: Ortiz, at 8: Thomas, at 103; Saraceno, at 107-09. The defendant was then placed in a police vehicle, read his rights again, and driven to the Troop F Barracks in Westbrook. Record: Report, at 1; Ortiz, at 10; Thomas, at 104; Saraceno, at 107-09, 126. Once again, the defendant stated that he understood his rights. Record: Report, at 1; Ortiz, at 10; Thomas, at 104; Saraceno, at 107-09. CT Page 9956
Upon reaching the barracks, at approximately 4:20 p. m., the defendant was again read his Miranda rights from a Notice and Waiver of Rights Form ("State's Exhibit #1") Record: Report, at 1; Ortiz, at 14; Thomas, at 1-2; Saraceno, at 77-78, 111, 126. Additionally, the defendant was asked to read the rights to himself, mark his initials next to each constitutional right after reading it, and sign his name at the bottom of the form if he agreed to waive those rights. Record: Ortiz, at 14; Thomas, 1-2; Saraceno, at 111. The defendant did in fact so read, initial and sign the document at this time, and understood that by doing so he was waiving the rights stated thereon. Record: Saraceno, at 78-79, 114-15, 126.
The defendant was then brought to the detective room on the second floor of the barracks, where he was interviewed by Detectives Ortiz and Thomas. Record: Report, at 1-2; Ortiz, at 16; Thomas, at 3; Saraceno, at 79, 114-15. The defendant was asked to name some of his closest friends, which he did. Record: Report, at 2; Saraceno, at 79, 115-16. Thereafter, the defendant was asked whether he had any knowledge of, or involvement in, the acts of vandalism that had been occurring in and around the towns of Haddam and Killingworth. Record: Report, at 2; Ortiz, at 17; Thomas, at 5; Saraceno, at 80.
The defendant admitted to being involved in many acts of vandalism, which he and his friends termed "breaking." Record: Report, at 2; Ortiz, at 17-18; Thomas, at 5; Saraceno, at 84-85, 116-17. Specifically, the defendant admitted to being involved in the stealing and/or destruction of street signs, the smashing of mailboxes, the breaking of a plate glass window at the Haddam-Killingworth High School, the locking of the gates to the Haddam Killingworth High School bus yard, the destruction of a public pay phone receiver, and the burning of a 1991 GEO Storm vehicle. Record: Report, at 2-3; Ortiz, at 17-22; Thomas, at 5-9; Saraceno, at 84-85, 105, 117-20.
Next, the defendant was asked if he had any knowledge of, or involvement in, the burning of the school buses at the Haddam-Killingworth High School. Record: CT Page 9957 Report, at 4; Ortiz, at 24; Thomas, at 10; Saraceno, at 128. The defendant vehemently denied having any such knowledge of, or involvement in, this incident, stating that he had been with his girlfriend at her parent's home during the entire evening in question. Record: Report, at 4; Ortiz, at 24-25; Thomas, at 10; Saraceno, at 128.
At approximately 6:40 p. m., the defendant was brought downstairs, where he was processed, placed in a holding cell, and fed. Record: Report, at 4; Ortiz, at 25; Thomas, at 11-12; Saraceno, at 85, 132-33. Between 6:40 p. m. and 8:25 p. m., the defendant was again informed, for the fourth time, of his Miranda
rights. Record: Report, at 4; The defendant stated that he understood his rights, and again signed a form waiving those rights ("State's Exhibit #2"). Record: Ortiz, at 26-28, 33; Thomas, at 13; Saraceno, at 86, 132-33. According to the defendant's testimony, moreover, immediately after signing this second waiver form, he said "I want a lawyer," to which Detective Ortiz responded that that would be taken care of later. Record: Saraceno, at 87, 118-19.
At approximately 8:25 p. m., the defendant was brought back to the detective room on the second floor of the barracks, where the defendant was advised of, and acknowledged, his rights for the fifth time. Record: Ortiz, 33-34, Saraceno, at 133. Detectives Ortiz and Thomas began questioning him again, and the defendant again admitted to being involved in the acts of vandalism described earlier, excluding the destruction of the school buses. Record: Report, at 4; Ortiz, at 30, 39; Thomas, at 15, 18; Saraceno, at 87. Upon being questioned about the bus fire incident, however, the defendant continued to deny any involvement, up until after 10:25 p. m. Record: Report, at 5; Ortiz, at 31; Saraceno, at 135. Further, at approximately 10:00 p. m., the defendant asked the detectives if he could call his parents; the detectives refused the defendant's request, stating that calling his parents "was a privilege not a right." Record: Saraceno, at 88-89. According to the defendant, moreover, he told the detectives that he wanted to call his parents in order to have them get him an attorney. Record: Saraceno, at 88. CT Page 9958
Between 8:25 p. m. and 10:25 p. m., other happenings were also occurring at the Troop F Barracks. Specifically, the defendant's father, Mr. Richard Saraceno, who had previously phoned his attorney and had made at least two phone calls to the barracks requesting to speak to the person in charge of his son's case, arrived at the barracks at approximately 8:40 p. m. Record: Father's Testimony ("Father"), at 43-47, 61-62. Upon arrival, he identified himself to the trooper behind the desk, and told him that he wished to speak to Detective Ortiz, who had previously informed him that he would be allowed to speak to his son. Record: Father, at 47. At some point prior to 10:15 p. m., after receiving a phone call in the detective room, Detective Ortiz left the interview and went downstairs to speak to the defendant's father in the lobby of the barracks. Record: Ortiz, at 40; Thomas, at 18-19; Saraceno, at 88. When the defendant's father asked to speak to his son, Detective Ortiz stated that the police wanted to speak to the defendant for a while longer, and that the defendant's father could speak to his son, in private if he wished, in approximately forty-five (45) minutes. Record: Father, at 47-48. After an hour and a half had passed, and Detective Ortiz had failed to return to the lobby, the defendant's father again asked at the desk to speak to Detective Ortiz. Record: Father, at 48-49. Neither Detective Ortiz nor anyone else came to see him at this time. Record: Father, at 49.
Upon inquiring again at the desk a bit later, Detective Ortiz did come back to the lobby to speak to him. Record: Father, at 49. At this time, the defendant's father told Detective Ortiz that he wanted to speak to his son, that his son was being questioned for a long time, and that he did not believe that his son had waived his right to an attorney. Additionally, the defendant's father told Detective Ortiz that he wanted to speak to his son personally in order to find out whether he had in fact waived his rights, and to let his son know that he wanted to get him an attorney. Record: Father, at 50. According to the testimony of Detective Ortiz, however, although the defendant's father did state that he wanted to speak to his son, he never mentioned wanting to get him a lawyer. Record: Ortiz, at 89-90. CT Page 9959
In response, Detective Ortiz stated that they could speak to the defendant for as long as they wanted, because the defendant had waived his rights, and because the defendant's father was "in their house." Record: Father, at 50. Additionally, Detective Ortiz told him he should go home, and that they would have his son phone him when they were through with him. Record: Father, at 51. The defendant's father told Detective Ortiz he was staying, and he did stay until approximately 1:05 a.m. Record: Father, at 50-52.
Meanwhile, at approximately 10:15 p. m., Sergeant Martin, who had recently completed the search of the defendant's residence, took over for Detective Ortiz in the detective room, where the interrogation of the defendant was still going on. Record: Report, at 5; Martin, at 83, Thomas, at 19; Saraceno, at 137. Upon arrival, Sergeant Martin showed various articles to the defendant, including two closed cans allegedly containing a pair of boots found at the defendant's residence, a couple of closed paper bags, and some beer cans allegedly found at the scene of the bus burning incident. Record: Thomas, at 21-22; Saraceno, at 89-91, 137-38.
It is at this point, approximately 10:15 p. m., that the parties' stories of what occurred in the detective room diverge. According to the defendant, after viewing the evidence obtained at his residence, he informed the detectives that he wanted to get an attorney, whereupon the detectives exhibited a telephone to him, directed him to the Notice of Rights and Waiver Form that he had previously signed, and informed him that he could get an attorney at any time he wanted. Record: Saraceno, at 91-92, 138-40, 142. At this point, the defendant claims, although he informed the detectives that he did not know the phone numbers of any attorneys, they failed to provide him with either a phone book, or a list of attorneys, or an actual attorney. Record: Saraceno, at 91-93. Additionally, the defendant claims that he also stated to the detectives that he had wanted his parents to call an attorney for him. Record: Saraceno, at 91-92. Further, although the defendant requested that he be able to phone his parents so that they could get an attorney for him, the investigators refused to allow him to do so. Record: Saraceno, at 170. CT Page 9960
Rather, they began asking him specific questions about the bus fire incident again. Record: Saraceno, at 93, 146. David Saraceno testified that the officers berated him with detailed accusations regarding the bus fire incident so harshly and for so long (approximately two hours) that, although he initially continued to deny their questions, eventually he became so upset and frightened that he began agreeing with their statements regarding the incident, and fabricating details about the incident himself, simply so they would let him out of the room. Record: Saraceno, at 93-99, 146, 169. The defendant claims he confessed to involvement in the incident, moreover, based on the conclusion he ultimately reached during the interrogation that the police were not going to release him unless and until he confessed; record: Saraceno, at 102; and because he was very scared by the threat by the police that if he didn't give them what they wanted they would put him in the New Haven jail where he would be raped. Record: Saraceno, at 97, 170.
The State's version of what happened during this time period, however, is strikingly different; According to the State, at approximately 10:15 p. m., the defendant asked the interviewing officers if he still had the right to contact an attorney. Record: Thomas, at 22, 70, 72; Martin, at 47, 87, 121. In response, Detective Thomas held up the Notice of Rights and Waiver Form which the defendant had previously signed, directed him to a telephone sitting on the desk in front of him, and told him he could use the phone at any point he would like during the interview. Record: Thomas, at 23, 48, 72; Martin, at 87-88, 121-22. At this point, according to the state, the defendant put his head down and said "No, that's O.K."; record: Thomas, at 23; and actually pushed the phone away. Record: Thomas, at 72; Martin, at 49, 88. Detective Thomas conceded, however, that he did not provide the defendant with a phone book, despite the fact that the defendant had told them that he did not know any attorneys. Record: Thomas, at 48, 73.
Next, according to the state, the defendant initiated the subsequent interrogation by asking, "Are you ready to hear a long story?" Record: Thomas, at 22; Martin, at 87. The officers asked the defendant to explain the story CT Page 9961 in chronological order. Record: Martin, at 91. The defendant then proceeded to describe, in a narrative form, the story of his life, including the details of his childhood, the various acts of vandalism that he later became involved with, and, ultimately, the details of his involvement, along with Keith Thompson and Damon Dombroski, in the bus fire incident. Record: Thomas, at 22, 25-32; Martin, at 91-92, 98.
The Report written and signed by the investigating officers, however, clearly indicates that, subsequent to the colloquy concerning an attorney, the police — rather than the defendant — initiated the questioning. Specifically, the Report states that after "Saraceno actually pushed the telephone away and didn't make any effort to contact an attorney," they "ask[ed] Saraceno what it was that was troubling him so much, and ask[ed] him if he did in fact take a part in the bus fires or had knowledge of it . . ." Record: Report, at 6.
III. INTERROGATION PROCEDURE AND RECORDKEEPING
Today, police officers interviewing suspects have a wide range of modern technology available to them to help preserve the words and actions of those individuals they bring into custody and question. In the present case, however, although each of the police officers who interrogated the defendant conceded that they have both audio and visual recording devices readily available to them to preserve what transpires during their interviews, no audiotape or videotape was ever made of the defendant. Record: Ortiz, at 48-49; Thomas, at 35, 39-41, 60-61; Martin, at 105-06, 107-08. This was not done, according to the police officers, because, although there is no written policy on the subject, it is their "unwritten policy" not to audiotape or videotape any suspect being interviewed; record: Ortiz, at 61-62; because it makes people "less cooperative"; record: Thomas, at 35; and causes a lot of "uneasiness," both on the part of the suspect and the interviewer, thereby inhibiting the "free flow of information." Record: Martin, at 105-06, 107-08. For these reasons, they did not inquire as to whether the defendant was willing to be audiotaped or videotaped. Record: Saraceno, at 99. CT Page 9962
Moreover, the police officers, at the conclusion of their interrogation of the defendant, did not reduce the contents of said interrogation to a written statement that the defendant could then read and sign, or inquire as to whether the defendant would be willing to sign such a writing. Record: Martin, at 108; Saraceno, at 99.
Further, although the defendant in the present case was continuously interrogated from approximately 4:30 p. m. until 6:40 p. m., and again from 8:25 p. m. until 2:25 a.m.; record: Thomas, at 42; out of the three interviewing officers, only one — Sergeant Martin — took any notes. Record: Martin, at 106. Said notes were taken, moreover, only for that portion of the interrogation during which Sergeant Martin was present, namely from approximately 10:15 p. m. until 2:25 a.m.
Finally, prior to and during the suppression hearing, each of the three interviewing officers refreshed their recollections of the events that had transpired by reading from the police report, dated August 28, 1994, which was not written until two days after the conclusion of the officers' lengthy interrogation of the defendant. Record: Report; Ortiz, at 74-75; Thomas, at 15, 36; Martin, at 106-07, 110, 116. Said report was drafted by Detective Thomas. Thomas did not take any notes during the entire interrogation. Record: Thomas, at 37, 39, 61. Detective Thomas drafted the report upon information based, collectively, on Sergeant Martin's notes; record: Thomas, at 61; Sergeant Martin's memory of the interrogation; record: Martin, at 116; Detective Ortiz's memory of the interrogation; record: Ortiz, at 79-80, 82; and Detective Thomas' memory of the interrogation. Record: Thomas, at 61. That is, the Report is a "collaboration," to use the officers' own words, of the independent memories of each of them. Record: Ortiz, at 77; Martin, at 106.
 IV. THE COURTS FACT FINDING METHODOLOGY
During the suppression hearing regarding the within matter, the witnesses were sequestered; thus, each witness testified outside of the presence and hearing of the other witnesses. David Saraceno, as the defendant, however, CT Page 9963 had a right to be present during all of the testimony of the other witnesses prior to his own testimony. All of the essential witnesses — David Saraceno, David's father, and the three police officers — have an interest in the outcome of the within motion to suppress.
The interrogation of David Saraceno was an emotional and stressful occurrence for those involved both in the interrogating room and outside that room. Moreover, the suppression hearing of this matter occurred almost one year after the interview of the defendant took place. Thus, to expect any of the witnesses to be able to recall and relate each and every detail, each and every word, and the sequence of events with exactitude, under the conditions and circumstances that present themselves in this case, is unrealistic.
This Court must not only determine the credibility of the various witnesses but also those individuals' ability to remember. Each of the witnesses in a situation such as the one at hand is inclined to psychologically rationalize his testimony and put his own spin on what in fact was said, when it was said, and how it was spoken.
Thus, when an interrogation is conducted as it was in this case, it is important that the court review the testimony of the various witnesses offered in a sequestered setting and, thereafter, piece it together. Further, it is essential that the court note other circumstantial occurrences that were taking place to determine how such occurrences bear on the testimony of the various witnesses taken separately and taken together. This Court has attempted to do that in the present case.
In the end, the question that presents itself is whether or not David Saraceno invoked his right to an attorney after having previously waived said right. It is this court's opinion that the burden should rest with the State to prove that the defendant did not invoke his right to counsel at any time during the entire interrogation process, because it is the police who control the conditions that exist during a custodial interrogation of suspects. CT Page 9964
When a suspect is arrested by the police and taken into custody, the suspect is without the means to capture the events that later transpire; the police, in contrast, as they are "in their own house" and have at their disposal the latest technological advances, are fully equipped to preserve the scene, as well as any voluntary confession that may subsequently develop.
Although this court was initially concerned with determining whether the State or the Defense bore the burden of proof on the issue of whether or not the defendant subsequently reinvoked his right to counsel, that issue is rendered "moot." This court, in its analysis of the facts, has objectively weighed all of the evidence presented by both sides, and is able to make a determination of the hereinafter "Findings of Fact" to a degree substantially more weighty than that of a fair preponderance.
With all of the above in mind, the Court makes the following relevant findings of fact:
V. FINDINGS OF FACT
1. Up until approximately 10:15 p. m., the defendant was fully aware of his rights, and knowingly and willingly waived those rights.
2. At approximately 10:15 p. m., the defendant inquired as to whether or not he still had the right to an attorney.
3. The investigating officers responded to this statement by holding up the waiver of rights form that the defendant had previously signed, and shoving the telephone on the table towards the defendant without further aid or assistance or questions.
4. No phone book was offered by the officers; no offer was made to get a phone book; no inquiry was made as to whether or not the defendant knew an attorney; no assurance that the state would provide the defendant with an attorney if he so desired, and that all questioning would cease until said attorney arrived, was made; no offer to leave the room while the CT Page 9965 defendant used the phone was made; and no offer to inquire of the defendant's father — who the detectives knew was in the waiting room of the barracks — as to who to call was made. Record: Thomas, at 48.
5. None of the above was done, when in fact the officers were fully aware of the fact that the defendant did not know any attorneys.[1]
6. The defendant pushed the phone that had been shoved at him away from him.
7. The investigating officers immediately began interrogating the defendant about the bus fire incident again. Record: Report, at 6.
8. Some two hours later, the defendant eventually confessed to his involvement in said incident.
9. At no time prior thereto had the defendant admitted he was involved in the bus fire incident. Rather, up until this time, the defendant had vehemently denied any involvement in, or knowledge of, the bus burning incident, other than what he had read in the newspapers.
10. The detectives never told the defendant that his father, who had been in the waiting room for almost two hours, wanted to speak to him about getting him an attorney. The detectives never told the defendant that his father was present at the barracks.
 VI. CLAIMS OF THE PARTIES AND SUPPORTING EVIDENCE
In his motion to suppress, the defendant argues that his rights, under the fourth, fifth, sixth andfourteenth amendments to the United States Constitution, and under Article I, §§ 7 and 8 of the Connecticut Constitution, have been violated because: 1) he invoked, and did not subsequently waive, his right to counsel prior to providing the police with incriminating statements; 2) the incriminating statements made by the defendant were not voluntarily made, and were the products of psychological and physiological manipulation CT Page 9966 and coercion directed upon him by the police; and 3) the police failed to record, either electronically or stenographically, the incriminating statements allegedly made by the defendant. In his brief filed on June 16, 1995, however, the defendant failed to set forth any claim, accompanied by an independent analysis, under the Connecticut Constitution. Additionally, the defendant failed to brief the issue of whether his confession was voluntarily given, and the issue of whether the failure of the police to electronically or stenographically record said confession constituted a violation of his due process rights. Accordingly, under State v. Kyles, 221 Conn. 643, 657
n. 9, 607 A.2d 355 (1992), the court need not, and declines to, address these claims.
The State argues that the incriminating statements made by the defendant should not be suppressed, on the grounds that: 1) the defendant's inquiry to the police regarding whether he still had a right to an attorney was in no way a clear invocation of his right to counsel under Davis v. United States,129 L.Ed.2d 362 (1994); and 2) even assuming that the defendant did invoke his right to counsel by asking this question, he thereafter waived said right by his subsequent words and conduct.
VII. ISSUES
A. Whether the defendant's statement, "Do I still have a right to an attorney?", constituted an invocation of his right to counsel under the facts of the present case?
B. If so, whether the defendant's subsequent pushing of the telephone away from him constituted a knowing, intelligent, and voluntary waiver of his Miranda
rights under the facts of the present case?
VIII. DISCUSSION
A. Invocation of Right to Counsel
In the present case, the defendant first argues that his confession regarding the bombing of the GEO CT Page 9967 Storm and the burning of the buses was obtained in violation of his right not to be compelled to be a witness against himself under the fifth amendment to the United States Constitution, as interpreted in Edwardsv. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378, reh. denied, 452 U.S. 973, 101 S.Ct. 3128,69 L.Ed.2d 984 (1981), and Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Although the Miranda warnings were originally effective in state prosecutions only because they were a component of due process of law under the fourteenth amendment; . . . they have also come to have independent significance under our state constitution." (Citation omitted.)State v. Ferrell, 191 Conn. 37, 40-41,463 A.2d 573 (1983).
Any inquiry into the admissibility of a confession obtained while a defendant is in custody begins withMiranda v. Arizona, supra:
 In that case, the United States Supreme Court held that the fifth and fourteenth amendments' prohibition against compelled self-incrimination requires that a suspect in police custody be informed specifically of his or her right to remain silent and to have an attorney present before being questioned. The court further held that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease"; and "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Furthermore, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."
State v. Acquin, 187 Conn. 647, 666, 448 A.2d 163
(1982), cert. denied, 463 U.S. 1229, 103 S.Ct. 3570,77 L.Ed.2d 1411 (1983), quoting Miranda v. Arizona,supra, 16 L.Ed.2d 722-26. CT Page 9968
To reiterate:
 When a suspect is taken into custody, the Miranda
warnings must be given before any interrogation takes place. Either explicitly or implicitly, the custodian will ask whether the suspect waives the right to silence. If the state demonstrates a knowing and intelligent waiver . . . then any statements made to the police are not made inadmissible on Miranda grounds. If the accused expresses a desire to talk to a lawyer, however, the accused has invoked the right to silence and "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."
State v. Ferrell, supra, 191 Conn. 43-44, quotingEdwards v. Arizona, supra, 68 L.Ed.2d 386; State v.Acquin, supra, 187 Conn. 667. "Following such a request, authorities have three choices: They may simply hold the suspect for prompt arraignment, without summoning an attorney, so long as no interrogationtakes place; they may call the attorney themselves; or they may permit the accused to make the call." (Emphasis added.) State v. Ferrell, supra,191 Conn. 44-45.
The Miranda warnings set forth above "represent the belief, deep-seated in the Anglo-American legal tradition, that a person accused of a crime may be convicted only if exacting measures have been taken to assure that the accused has been treated with the most scrupulous fairness by agents of the government."State v. Barrett, 205 Conn. 437, 447, 534 A.2d 219
(1987), quoting State v. Ferrell, supra, 191 Conn. 41. The primary purpose of the Miranda warnings is to ensure that an accused is aware of the constitutional right to remain silent before making statements to the police. State v. Ferrell, supra, 191 Conn. 41.
Additionally, "[t]he Miranda warnings reflect the perception that the lawyer occupies a critical position in our legal system because of his [or her] unique ability to protect the [due process] rights of a client CT Page 9969 undergoing custodial interrogation." (Citation omitted; internal quotation marks omitted.) State v. Barrett,supra, 205 Conn. 447-48. Indeed, at least one court has recognized that "[b]y informing a person held in custody of the right to consult with an attorney prior to and during police interrogation, the warnings . . . significantly enhance that person's opportunity to make a knowing, intelligent and voluntary decision whether to speak or remain silent." Id., 447.
In the past, where an individual subjected to a custodial interrogation had explicitly stated "I want an attorney," that person was found to have clearly invoked a right to counsel under Miranda and its progeny. Where an individual had said or done anything less, however, the matter has typically required more analysis. Indeed, within the last thirty years, the state and federal courts have developed three different approaches to addressing a suspect's ambiguous or equivocal request for counsel.
 Some jurisdictions have held that any mention of counsel, however ambiguous, is sufficient to require that all questioning cease. Others have attempted to define a threshold standard of clarity for invoking the right to counsel and have held that comments falling short of the threshold do not invoke the right to counsel. Some jurisdictions . . . have held that all interrogation about the offense must immediately cease whenever a suspect mentions counsel, but they allow interrogators to ask narrow questions designed to clarify the earlier statement and the [suspect's] desires respecting counsel.
(Citation omitted; internal quotation marks omitted.)Davis v. United States, supra, 129 L.Ed.2d 369.
The Connecticut Supreme Court, in State v. Acquin,supra, persuaded by the Fifth Circuit's approach to the problem, adopted the last approach outlined above:
 In Thompson v. Wainwright, 601 F.2d 768 (5th Cir. 1979), also cited in Edwards v. Arizona, supra, the CT Page 9970 Fifth Circuit clarified the rule: "[W]henever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. Further questioning thereafter must be limited to clarifying that request until it is
clarified. When and if it is clarified as a present desire for the assistance of legal counsel, all interrogation must cease . . ." (Emphasis in original.) Thompson v. Wainwright, supra, 601 F.2d 771.
 We believe that Edwards v. Arizona must be read to include this common sense Fifth Circuit rule, which was implicitly approved by the majority, and specifically stated in Justice Powell's concurring opinion.
State v. Acquin, supra, 187 Conn. 673-75. In adopting this approach, however, the Acquin Court was interpreting, and applying, the federal constitution's protections rather than those protections afforded by our state constitution. Arguably, therefore, the Acquin
decision may now be superceded by Davis v.United States, supra, the United States Supreme Court's most recent decision regarding the issue.
In Davis v. United States, supra, the Court, confronted with the issue presently before this Court, "decline[d] to adopt a rule requiring officers to ask clarifying questions" when confronted with an ambiguous request for counsel. Davis v. United States,supra, 129 L.Ed.2d 373. Rather, the Court held that "after a knowing and voluntary waiver of the Miranda
rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Id. In so holding, however, the Court did not rule that a suspect must specifically use the words "I want an attorney" in order to sufficiently invoke his right to counsel. Rather, the Court held only that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id., 371.
In the present case, it is undisputed that the defendant was read the Miranda rights before the confession CT Page 9971 regarding the bus incident was given, and it appears from the record that he, at least initially, understood and waived those rights. However, "[e]ven after a suspect has validly waived his or her rights, there exists a `continuous opportunity' to invoke or reinvoke the rights `in any manner and at any stage of the process' of interrogation." State v. Stoddard, 206 Conn. 157,173, 537 A.2d 446 (1988), quoting Miranda v. Arizona,supra, 16 L.Ed.2d 706-07.
In this regard, it is also undisputed that the defendant specifically stated, at approximately 10:15 p. m. "Do I still have a right to an attorney?", and made clear to the interviewing officers that he did not know any attorneys. Further, it is undisputed that the interviewing officers neither provided the defendant with a phone book or a list of attorneys' names and/or telephone numbers, nor offered to obtain an attorney on the defendant's behalf. Rather, all the interviewing officers did was hold up the notice and waiver of rights that the defendant had previously signed, and shove a telephone in his direction. Finally, the Court finds that, eventually, the defendant pushed the telephone away from his person, and proceeded, after questioning was initiated by the police, to confess to his involvement in the bus incident.
When words are spoken, the meaning conveyed is not only found in the definition of the words themselves; rather meaning is also found by an examination of the circumstances that existed at the time the words are spoken, as well as the conduct and manner of the individual speaking them. In this regard, factors to consider include: the setting within which the words are spoken; the body language of the speaker at the time the words are spoken; and the emotion with which the speaker utters the words. The words "Do I still have a right to an attorney?", spoken in even tones in a calm setting in a non-expressive manner may mean one thing, while those same words, spoken with hands raised, while shaking one's head with strong intonation and emotion may convey an entirely different meaning.
It is undisputed that the defendant's words and CT Page 9972 actions prompted the interviewing officers to present a telephone to the defendant; accordingly, the court finds it reasonable to conclude that said officers believed, in their own minds, that the defendant was making a request for an attorney.
Applying the law set forth herein to the facts of the present case, the Court finds that the defendant's words and actions, as described above, constituted an invocation of his right to counsel, because "a reasonable police officer in the circumstances [as they existed at this time] would [have] underst[oo]d the [defendant's] statement to be a request for an attorney."Davis v. United States, supra, 129 L.Ed.2d 371. Here, as in State v. Ferrell, supra:
 [b]y his request to call an attorney . . . the defendant had clearly indicated his intent not to give a statement . . . and . . . the defendant's attempt to exercise his right to consult with an attorney resulted in the interception by the authorities of the very sort of incriminating statement which the Miranda
warnings seek to guard against. The use at trial of statements obtained from the defendant while he was attempting to take up the protective shield of Miranda deprived him of the due process of law by which he was constitutionally entitled to have his guilt determined.
(Citations omitted; internal quotation marks omitted.)State v. Ferrell, supra, 191 Conn. 42-43.
The court acknowledges that circumstances may exist where a fleeting reference to an attorney, considered in context, does not amount to an invocation. In the present case, however, the court finds that the defendant's inquiry regarding whether he still had a right to an attorney, cannot be so parsimoniously construed. Rather, the court finds that the defendant's inquiry, under the circumstances as they existed at the time the statement was made, constituted an unambiguous and unequivocal attempt to invoke a present right to counsel. State v. Anderson,209 Conn. 622, 627, 553 A.2d 589 (1989). CT Page 9973
B. Voluntary, Knowing, and Intelligent Waiver
"[A]n accused in custody, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless he [the defendant] validly waives his earlier request for the assistance of counsel." (Citations omitted, internal quotation marks omitted.) State v. Anderson, supra,209 Conn. 627. See also State v. Barrett, supra,205 Conn. 448 ("[i]n the absence of a subsequent waiver, an accused who invokes his right to counsel in accordance with Miranda warnings may not be further interrogated until he has been able to secure the advice of an attorney").
Thus, the Court's conclusion that the defendant invoked his right to counsel in a sufficiently clear manner does not end the Court's inquiry. Rather, the next question is whether the defendant thereafter "voluntarily, knowingly and intelligently" waived his rights. State v. Acquin, supra, 187 Conn. 677.
Certainly, there can be an intelligent and knowing waiver of one's Miranda rights. Such a waiver, however:
 should not be effectuated through the back door. The Miranda concept is not a battle of wits. There is a threat to due process when an unsophisticated defendant is offered a right, and is eventually impaled by its usage . . . [Thus,] "[i]n order . . . to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."
(Citations omitted; internal quotation marks omitted; emphasis in original.) State v. Ferrell, supra,191 Conn. 42, quoting Miranda v. Arizona, supra,16 L.Ed.2d 719. Further, courts indulge every reasonable presumption against a waiver of fundamental constitutional rights, do not presume acquiescence in the loss of fundamental rights, and do not presume a waiver of a fundamental constitutional right from a silent record. (Citations omitted.) State v. Shockley,
CT Page 9974188 Conn. 697, 707, 453 A.2d 441 (1982).
"The standard for waiver, where an in-custody interrogation is involved, is that announced in Johnsonv. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019,82 L.Ed. 1461 (1938): `A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege . . . [which] must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" State v. Acquin, supra,187 Conn. 666-67.
 Waiver is not conclusively established by demonstrating that Miranda warnings were given and understood. Nor is it conclusively rebutted by refusal to sign a form waiving Miranda rights; nor by refusal to sign a written statement in the absence of legal counsel. In the absence of an express waiver, the state bears the heavy burden of demonstrating, as a matter of fact, that waiver can be clearly inferred from the actions and words of the person interrogated.
(Citations omitted; internal quotation marks omitted.)State v. Harris, 188 Conn. 574, 579-80, 452 A.2d 634
(1982), cert. denied, 460 U.S. 1089, 103 S.Ct. 1785,76 L.Ed.2d 354 (1983).
The state bears the burden of proving, by a preponderance of the evidence, that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.State v. Wilson, 183 Conn. 280, 286-87,439 A.2d 330 (1981), citing Miranda v. Arizona, supra,16 L.Ed.2d 724. "Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden [to show said waiver] is rightly on its shoulders." (Citations omitted; internal quotation marks omitted.)State v. Wilson, supra, 183 Conn. 284.
A waiver of Miranda rights need not be by an CT Page 9975 express statement but may be inferred from the actions and words of the person interrogated. Id., 284. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case." (Citation omitted; internal quotation marks omitted.) Id. In this regard, "[t]he waiver must be made voluntarily, and with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." (Citation omitted; internal quotation marks omitted.) State v. Boscarino, 204 Conn. 714,743, 529 A.2d 1260 (1987).
The trial court, in its discretion, makes all of the above determinations; said discretion, however, must be exercised in accordance with constitutional standards of due process. State v. Acquin, supra,187 Conn. 677; State v. Derrico, 181 Conn. 151, 157-58,434 A.2d 356, cert. denied, 449 U.S. 1064,101 S.Ct. 789, 66 L.Ed.2d 607 (1980).
In the present case, the court finds that, subsequent to his invocation of his right to counsel, no express written or oral statement was made by the defendant indicating that he wanted either to rely on his rights or to waive them; therefore, before a conclusion of waiver can be supported, the state must demonstrate: (1) that the defendant understood his rights, and (2) that the defendant's course of conduct indicated that he did, in fact, waive those rights. (Citation omitted.) State v. Wilson, supra, 183 Conn. 284-85. See also State v. Shifflett, 199 Conn. 718, 731-32,508 A.2d 748 (1986) (same).
Here, the court finds that the only evidence to indicate that the defendant may have waived his right to counsel, after invoking it, is his action in pushing the telephone, that had previously been shoved at him by the police, away from him. The court finds that said action, in and of itself, is insufficient to show that the defendant knowingly, intelligently, and voluntarily waived his right to counsel. Indeed, the defendant's action in this regard, under the circumstances as stated herein, may just as easily be interpreted as an involuntary act of frustration by the defendant, given CT Page 9976 the fact that: the defendant had been subject to police interrogation for approximately six hours by this time, the defendant did not know any attorneys, the defendant knew that the police knew that he did not know any attorneys, and the police failed to assist the defendant in obtaining an attorney, leading the defendant to reasonably believe that the police would not release him from the room until they obtained a confession from him.
Under these circumstances, the court finds that the shoving of a telephone in the direction of the defendant was an empty gesture, because the right to counsel before further police questioning is meaningless without the means to contact and obtain an attorney. Accordingly, the court finds that the state has failed to sustain its burden of showing that the defendant knowingly, intelligently, and voluntarily waived his right to counsel.
Once again, however, the court s inquiry is not yet at an end. In Edwards v. Arizona, the United Supreme Court after reconfirming the principles enunciated inMiranda v. Arizona, supra, further held that:
 [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. we further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."
(Emphasis added.) State v. Acquin, supra, 187 Conn. 667, quoting Edwards v. Arizona, supra,68 L.Ed.2d 386.
Thus, Edwards v. Arizona, supra, "does not prohibit communication between police and a suspect who has requested an attorney"; rather, it only "prohibits the CT Page 9977 use of confessions obtained when police initiate renewed custodial interrogation after such a request."State v. Acquin, supra, 187 Conn. 667-68. This is so because "[t]he Supreme Court has stated quite clearly that the Miranda safeguards are relevant only when an in-custody accused is subject to interrogation." Id.,
668. "Interrogation means any words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Citations omitted; internal quotation marks omitted.)Id.
Therefore, "[t]he relevant inquiry when a defendant has clearly invoked his right to counsel is to ask, first, was there in fact subsequent interrogation and, second did the police initiate it. (Emphasis in original.)Id., citing Edwards v. Arizona, supra, 68 L.Ed.2d 390
(Powell J., concurring in the result).
In the present case, the police report itself clearly indicates that after "Saraceno actually pushed the telephone away and didn't make any effort to contact an attorney . . ." the police "ask[ed] Saraceno what it was that was troubling him so much, and ask[ed] him if he did in fact take a part in the bus fires or had knowledge of it, and that, subsequent thereto, the defendant stated "that he did in fact have knowledge and wanted to know if . . . [the police] were ready to hear a long story." Record: Report, at 6.
Based on the exchange set forth above, the court finds that interrogation did take place after the defendant invoked his right to an attorney, and that said interrogation was initiated by the police. Accordingly, the court holds that any incriminating statements made by the defendant after 10:15 p. m. were unconstitutionally obtained by the police, under Miranda
and its progeny and, consequently, must be suppressed. Those statements made prior to 10:15 p. m. by the defendant, however, were properly obtained and are not suppressed.
IX. CONCLUSION
Prior to 10:15 p. m. on August 25, 1994, the defendant CT Page 9978 voluntarily made incriminating statements against himself; these statements were lawfully obtained under the United States Constitution, as well as Miranda and its progeny. Accordingly, said statements are not suppressed by the court.
At approximately 10:15 p. m., however, the defendant invoked his right to counsel. Thereafter, moreover, the defendant did not knowingly, intelligently, and voluntarily waive that right. Nonetheless, the defendant was not provided with a fair and meaningful opportunity to obtain an attorney prior to further police interrogation. Accordingly, all incriminating statements made by the defendant after 10:25 p. m. were unconstitutionally obtained, and are hereby suppressed.